IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

IN RE:                                              )
TRILOGY DEVELOPMENT COMPANY,                        )
                                                    )          Case No. 09-42219-DRD-11
                        Debtor.                     )          Chapter 11
_____             )
                                                    )
TRILOGY DEVELOPMENT COMPANY, LLC,                   )          Adversary No. 10-4016
                        Plaintiff,                  )
v.                                                  )
                                                    )
BB SYNDICATION SERVICES, INC., *et al.*,            )
                                                    )
                        Defendants.                 )
                                                    )

**MEMORANDUM OPINION DENYING IN PART AND GRANTING IN PART BBSSI'S
MOTIONS FOR SUMMARY JUDGMENT AGAINST A.T. SWITZER, APPLIED
TECHNICAL SERVICES, INC., HARSCO CORP., METRO TILE CONTRACTORS AND
WALTON CONSTRUCTION CO., AND DETERMINING THE VALIDITY,
ENFORCEABILITY AND AMOUNT OF CERTAIN MECHANICS' LIENS**

This adversary comes before the Court on the Motion for Summary Judgment filed by

defendant BB Syndication Services, Inc. ("BBSSI") against A.T. Switzer Company ("Switzer") and

the Motion for Summary Judgment filed by BBSSI against Applied Technical Services, Inc. ("ATS"),

Harsco Corporation ("Harsco"), Metro Tile Contractors, Inc. ("Metro") and Walton Construction Co.,

LLC ("Walton"), and the objections by BBSSI and J.E. Dunn ("Dunn") to mechanics' liens claimed

by various claimants and the objections by BBSSI to the mechanic's lien claim of Dunn.  BBSSI

seeks judgment as a matter of law that Switzer, ATS, Harsco, Metro and Walton do not retain a valid

mechanic's lien against property of the bankruptcy estate.  This is a core proceeding under 28 U.S.C.

§157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a) and

(b)(1).  The following constitutes the Court's Findings of Fact and Conclusions of Law in accordance

with Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons set forth below, the

Court finds that BBSSI is not entitled to a judgment as a matter of law against Metro and Walton, but

will enter judgment as a matter of law against Switzer and ATS[1]. Also for the reasons set forth below,

the Court overrules, with one exception, the objections to mechanic's lien claims.

## I. FACTUAL SUMMARY

Trilogy Development Company, LLC ("Trilogy" or "Debtor") is a real estate development

company that owned and developed a site for construction of a hotel, office building and parking

garage (the "Project"). On December 5, 2005, Trilogy and Dunn, together with its subcontractors

and other general contractors and their subcontractors, entered into a contract (the "Contract")

providing for construction services and materials on the real estate, and construction on the

Project began soon thereafter.

BBSSI made a construction loan to finance the costs of construction of the Project and

holds a deed of trust to secure that loan. Disputes arose during construction on the Project and

Debtor stopped paying its contractors. Dunn and other contractors and subcontractors stopped

work on the Project and filed mechanics' liens. Thereafter, in May 2009, Debtor filed a Chapter

11 petition and in January 2010, it filed an adversary action against all mechanic's lien claimants

("Claimants") and BBSSI seeking a determination of the validity and priority of the liens.

Procedures were put into place to deal with the multiple mechanic's liens and objections thereto.

BBSSI (which had taken over as Plaintiff in place of Trilogy) and Dunn both filed reports

specifying their objections to each mechanic's lien. The various Claimants then filed objections

to the reports. The trial was bifurcated and the Court first heard and decided the issues of priority

---

[1]Harsco has withdrawn its claim; therefore the Motion for Summary Judgment as it relates to Harsco is
denied as moot.

between Dunn's lien and BBSSI's deed of trust and Dunn's compliance with statutory notice

requirements in Phase I.  The issues regarding validity and amount of the mechanic's liens were

heard in Phase II.

In August 2010, an auction was held to sell the asset and the sale was approved by the

Court on August 31, 2010.  In the fall of 2010, the Court resolved Phase I by summary judgment

and trial.    In April 2011, a two day trial was held on the Phase II issues. The Court took evidence

on some of the liens and others were submitted on stipulation.  There are also two motions for

summary judgment at issue filed by BBSSI against certain Claimants.

## II.  **MOTIONS FOR SUMMARY JUDGMENT**

### A.  **Standard for Summary Judgment**

Federal Rule of Bankruptcy Procedure 7056(c), applying Federal Rule of Civil Procedure

56(c), provides that summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue of material fact and that the moving party is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment has the initial burden of proving that there is no genuine

issue as to any material fact.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 161 (1970).

Once the moving party has met this initial burden of proof, the non-moving party must set

forth specific facts sufficient to raise a genuine issue for trial, and may not rest on its pleadings or

mere assertions of disputed facts to defeat the motion.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith

Radio Corp.*, 475 U.S. 574, 586-87 (1986).  "A 'genuine issue' in the context of a motion for

summary judgment is not simply a 'metaphysical doubt as to the material facts.'" *Id*.  Rather, "a

genuine issue exists when the evidence is such that a reasonable fact finder could find for the non-movant." *Buscaglia v. United States*, 25 F.3d 530, 534 (7th Cir. 1994). When reviewing the record for summary judgment, the court is required to draw all reasonable inferences in favor of the non-movant; however, the court is "not required to draw every conceivable inference from the record-only those inferences that are reasonable." *Bank Leumi Le-Isreal, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991).

## B. <u>Summary Judgment is Proper Against Switzer</u>

BBSSI filed a motion for summary judgment against Switzer seeking discharge of Switzer's mechanic's lien claim. BBSSI alleged, and Switzer admitted, that Switzer did not file a mechanic's lien with the Clerk of the Court, rather it recorded its lien statement with the Jackson County Recorder of Deeds. As noted by BBSSI, Missouri courts have found that the foundation of a mechanic's lien is the lien statement filed with the clerk of the circuit court of the county where the property is located. Unless this lien statement, which must be in substantial compliance with the provisions of the statute, is filed as required by the statue, no lien attaches." *Landers Lumber & Cement Co. v. Short*, 37 S.W.2d 981 (Mo. Ct. App. 1931). While the Court agrees with Switzer about the proposition that mechanic's lien laws in Missouri are remedial in nature and should be liberally construed for the benefit of the lien claimants, *see BCI Corp. v. Charelbois Const. Co.*, 673 S.W.2d 774, 780 (Mo. 1984), this liberal policy is not open-ended and does not relieve a lien claimant of reasonable and substantial compliance with statutory requirements. *See Mitchell Engineering v. Summit Realty Co.*, 647 S.W.2d 130 (Mo. Ct. App. 1983). Here, § 429.080 requires the filing of the lien statement with the Clerk of the Court. The Court finds that recording a lien statement with the Recorder of Deeds is not in substantial

4

compliance with the statutory requirements.  Thus, Switzer has not met its burden of showing

substantial compliance with the statutory requirements of filing its lien statement with the Jackson

County Clerk of Court and the Court grants BBSSI's motion for summary judgment against

Switzer.

### C. Summary Judgment is Not Proper as to Metro Tile Contractors, Inc. Or Walton Construction Co., LLC

BBSSI argues that ATS, Metro and Walton did not provide the requisite 10-point bold type

Notice specified in § 429.012.1.  It asserts the same legal arguments that were previously set out in

the Motion for Partial Summary Judgment filed by Trilogy against Dunn on June 28, 2010 (the

"Dunn Motion"), specifically that the claimants did not strictly comply with the notice provisions

and therefore do not have a valid, enforceable mechanic's lien.  As the parties are well aware, this

Court ruled on that motion on October 5, 2010, and held that strict compliance was not necessary.

In part, this Court stated that it appears "that nearly all of the Missouri state court cases cited by

both Debtor and Dunn acknowledge, and in several instances apply, the notion of substantial

compliance with the statutory notice language and that none of them, including the Missouri

Supreme Court in *Gauzy*, has explicitly rejected the doctrine.  It is in no way clear to this Court

that Missouri's highest court would require absolute strict compliance with the statutory language

set forth in § 429.012.1."  Memorandum Opinion dated October 5, 2010, p. 10 ("Dunn Opinion").

This Court provided a detailed analysis setting forth its reasoning in the Dunn Opinion and

BBSSI has failed to provide a new argument that would cause the Court to reverse itself.  BBSSI

asserts in its motion that *Ambassador Floor Co. v. Bruner Builders, LLC*, 323 S.W.3d 38 (Mo. Ct.

App. 2010), was decided after its briefing on the Dunn Motion and that in that case the court

invalidated a lien due to the failure to provide the specific notice language.  However, as BBSSI

5

pointed out in its motion, and with which this Court agrees, that case made no mention whatsoever of the substantial compliance issue or of the multitude of cases that have applied such standard and that this Court discussed in detail in the Dunn Opinion.  This Court incorporates its prior analysis provided in the Dunn Opinion and reaffirms its ruling that the substantial compliance standard is the appropriate one to apply here.

With regard to Metro and Walton, BBSSI concedes that if this Court follows its ruling in the Dunn Opinion and applies a substantial compliance standard to the statutory notice requirement, then those claimants did in fact comply with the notice requirement under §429.012.1.   Accordingly, because this Court will follow its ruling in the Dunn Opinion, Metro and Walton complied with the notice requirement under §429.012.1 and the Court will deny BBSSI's Motion for Summary Judgment as to those claimants.

### D.  Summary Judgment is Proper as to ATS

ATS is in a different situation.  BBSSI does not concede that ATS substantially complied with the requisite notice.  Thus, ATS must submit evidence that it did in fact provide notice that would comply with the statutory requirement and bears the burden of proving such compliance. *See Ambassador Floor*, 323 S.W.3d at 41.  ATS failed to timely respond to BBSSI's Motion for Summary Judgment and the response that it did belatedly file failed to provide any evidence of its compliance with the notice requirement.  Nevertheless, the Court has reviewed the mechanic's lien documents filed in this case by ATS which were also attached to the Motion in an effort to determine if ATS could be said to have substantially complied with the notice requirement. Although the documents include a partial copy of the contract between ATS and Trilogy, they do not include any type of language which would meet even the most minimal of notice requirements.

6

For that reason, the Court concludes that ATS has failed to meet its burden of proving compliance with the statutory notice requirement, grants BBSSI's Motion against ATS and finds that its mechanic's lien be deemed invalid.

### III.  MEMORANDUM OPINION REGARDING BBSSI'S REPORT TO RESOLVE MECHANICS' LIEN CLAIMS AND OBJECTIONS THERETO

#### A.  Validity of Lien Claims of Rodriguez Mechanical Contractors, Inc.

The sole issue at trial regarding the mechanics' lien claims filed by Rodriguez Mechanical Contractors, Inc. ("Rodriguez") was the timeliness of the liens.  Rodriguez filed two lien claims, one for materials in the amount of $356,154.48 and one for labor in the amount of $218,852.25, on February 11, 2009.  On March 23, 2009, it filed amended lien claims relating to the originally filed claims.  BBSSI asserts that the last date of work done by Rodriguez was August 31, 2008, which was outside of the applicable six month time limit from the March 23, 2009 claims.  Rodriguez argues that the last date it provided materials and labor was September 23, 2008, which would fall within the six month filing time period from March 23, 2009.[2]

Pursuant to Mo. Rev. Stat. §429.080, a mechanic's lien claimant must file "a just and true account of the demand due" within six months after the indebtedness shall have accrued."  The term "accrued" is construed to mean "when the indebtedness becomes complete; when the last labor is performed or the last material is furnished under an agreement."  *See United Petroleum Serv. Inc. v. Piatchek*, 218 S.W.3d 477 (Mo. Ct. App. 2007) (citing *Shamrock Bldg. Supply v. St.*

---

[2]In the alternative, Rodriguez argues that the claims filed on March 23 relate back to the February 11 filings, and that February 11 is within the six month time period.  The Court need not reach the relation back issue because Rodriguez has provided sufficient evidence to support its claim that the last date of work performed was September 23, 2008.

*Louis Inv.*, 842 S.W.2d 556, 558 (Mo. Ct. App. 1992)).  The question for the Court is what was the last date labor was performed or material was furnished on the Project by Rodriguez.

At trial, Mr. Rodriguez testified that the company created certified payrolls from the records the general superintendent on the job turned in for the Project time for a given week.  He testified that the certified payroll records show that Rodriguez plumbers and utility workers worked approximately 362 hours on the Project for the week ending September 23, 2008.  Ex. 2908.  He also testified that the daily log kept by the site superintendent showed labor being done on storm drains on September 23, which would have used materials such as iron pipe and roof drains, and that invoices indicate materials were delivered to the Project as late as September 24.  Ex. 2911.  Further, the certified payroll records show that Rodriguez worked approximately 215 hours on the Project for the week ending September 30, 2008.  Ex. 2909.

BBSSI introduced evidence that Dunn's pay application through August 31, 2008 showed payment to Rodriguez for plumbing work and indicated that work was 108% complete,  Ex. 1108, and that Dunn's pay application through September 30, 2008 did not include any plumbing work for the period leading up to September 30.  Ex. 1109.  Mr. Rodriguez explained that the reason the documents show more than 100% completion was because they were asked to do work that exceeded the defined scope of work of the original contracts and that no written change orders were created.

Based on the testimony at trial and the company records, it is uncontradicted that the evidence shows that work was performed under both the labor and material contracts as late as September 25, 2008.  The fact that Dunn did not include any plumbing work on its pay application for the period up to September 30 does not support the contention that work was not performed by

8

Rodriguez during that time period.  How and when Dunn applied for payment as to its sub-

contractors can not serve to nullify the actual work logs and payroll records of Rodriguez.  As

conceded at trial, daily work logs in evidence show work being done and materials being delivered

up to September 25, 2008.  Thus, the March 23, 2009 lien statements are timely.[3]

### B.  Validity of LienClaim of Hayes Drilling Services, Inc.

Hayes Drilling Services, Inc. ("Hayes") filed its mechanic's lien statement on March 11,

2009,  in the amount of $71,399.70.  Hayes submitted a pay application to Dunn for eight hours of

work performed on October 3, 2008.  Hayes contends that this work is lienable as it was

contemplated by the parties' contract and requested to be performed by the contractor. On the

other hand, BBSSI objects to the lien and asserts that the work performed on October 3 was trivial

and performed merely to extend Hayes' six month time period in which to timely file a lien claim

under Mo. Rev. Stat. §429.080. BBSSI asserts that the work was essentially complete in August

2006 and thus, the lien statement was untimely.

Hayes specializes in drilled shaft and excavation support services.  It was working as a

subcontractor on the Project under Dunn.  Hayes provided shoring services and completed, as

scheduled, 100% of its shoring early in the project, prior to August 25, 2006.  Thereafter, Hayes

billed for and was paid the total amount owed to it less a retainage amount still owed.  On October

3, 2008, a Hayes employee returned to the job site to remove remaining temporary shoring and

other debris and billed approximately eight hours of work.

As noted above, a mechanic's lien claimant must file a statement within six months after

the indebtedness has accrued and the term "accrued" is construed to mean when the last labor is

---

[3]Counsel stated at trial that he believed the only difference between the February 11 lien statements and the amended March 23 lien statements was the legal description.

performed or the last material is furnished under an agreement. Work performed by a

subcontractor that is not intended to simply extend the time for filing a mechanic's lien but is

necessary to complete the project in a workmanlike manner operates to extend the lien deadline if

it is reasonably within the purview of the original contract. *A.E. Birk & Son Plumbing & Heating,*

*Inc. v. Malan Const.*, 548 S.W.2d 611, 616 (Mo. Ct. App. 1977).  When additional labor is

requested to be done, even if minor, the indebtedness does not become complete until that labor is

performed.  *See Midwest Floor Co. v. Miceli Dev. Co.*, 304 S.W.3d 243, 249 (Mo. Ct. App. 2009);

*see also, S & R Builders & Suppliers, Inc. v. Marler*, 610 S.W.2d 690 (Mo. Ct. App. 1980)(finding

repair work necessary for completion of project is lienable despite fact took only one hour to

complete and was small in comparison to overall scope of contracted work).

     At trial, Michael Hayes, the president of Hayes Drilling, testified regarding the contractual

scope of the shoring work and stated that it consisted of installing metal beams with boards by

drilling into rock and anchoring them around the project.  It further included the removal of the

temporary shoring.  Specifically, page 39 of the contract includes in the scope of work: "Removal

of trash and debris generated by the scope of work is the responsibility of the subcontractor.

Removal of all shoring systems 48 inches below grade at the appropriate time of backfill work."

Mr. Hayes testified that it is industry standard that trash is removed piecemeal and is done by one

or two workers.

     Further, Mr. Edwards, vice-president for Dunn, testified that the work done by Hayes to

complete the last of the contract work was consistent with Dunn's expectations and that Dunn

asked Hayes to perform that work.  He also testified that the final work Hayes performed was

defined in their contract from the beginning.

As noted, BBSSI objects to the lien and asserts that the work performed on October 3 was trivial and performed merely to extend the six month time period in which to timely file a lien claim under Mo. Rev. Stat. §429.080.  In support of its contention that the work was "trivial," BBSSI relies on *Floreth v. McReynolds*, 224 S.W. 995 (Mo. Ct. App. 1920).  In *Floreth*, the court determined that work done to charge a battery and install a drain pipe was non-lienable.  The work billing statement showed less than one hour of labor and the court found that the battery work was not required under the contract and that the drain pipe installation was "a purely incidental and trivial job– a mere makeshift on which to hang an otherwise barred lien."  *Floreth*, 224 S.W. at 998.  BBSSI also cites the Court to *Schwartz Materials Co. v. West End Realty & Const. Co.*, 154 S.W.2d 366 (Mo. Ct. App. 1941), in support of its contention that the work performed was merely trivial.  In that case, the claimant provided weather stripping on a building five months after completion of the contract and the court found such work was not necessary for the completion of construction.  Finally, BBSSI proffers *Westhold v. Mullenix Corp.*, 777 S.W.2d 257 (Mo. Ct. App. 1989), in which the court disallowed a lien claim as trivial because the evidence in support of the claim consisted solely of the number of employees and hours worked, without any statement of the work performed.  *Id.* at 266.

Each of the cases cited by BBSSI is distinguishable from the situation with Hayes.  In the instant matter, unlike in *Floreth*, the work was done upon the request of the general contractor and was a part of the scope of work defined in the parties' contract.  Similarly, the work in *Schwartz Materials* was not essential to completion of the contract and not contemplated by the parties. Here, the vice-president of Dunn testified that the work was expected to be done under the contract and that Dunn had requested that Hayes perform the work of removing the temporary shoring.  He

11

also testified that the specific work performed had to be done at the end of the project and could not have been performed at an earlier time. In *Westerhold* there was insufficient evidence to establish what specific work took place on the date; that is not the case here. Here, the work log contained a work description. Mr. Hayes testified what specifically that entailed and why it was necessary to complete the contractual scope of work.

The work performed by the Hayes employee on October 3 is instead similar to that allowed as lien claims in *United Petroleum* and *S & R Builders*. In *United Petroleum*, the court determined that work performed upon request, even if minor, is lienable if within the purview of the original contract and that the indebtedness does not become complete until that labor is performed. *United Petroleum*, 218 S.W.3d at 482-83. Likewise, in *S & R Builders*, one hour of labor was expended to correct a water leak. The court determined that such work was requested to be done by the owners before they accepted the work as complete and constituted a part of the original contract. *S&R Builders*, 610 S.W.2d at 694-95. The fact that the last amount of labor expended may be small compared to the entire construction project does not cause it to be unlienable. *Id.* Further, the fact that Hayes' pay applications indicate 100% completion prior to the October 3 work being performed is not indicative that such work was not required under the contract or had already been factored into prior billing. *See JR Meade Co. v. Forward Const. Co.*, 526 S.W.2d 21, 28 (Mo. Ct. App. 1975) (evidence showed that work required to complete the contract continued after contractor had billed 100% of work). Similarly, Hayes testified that although earlier pay applications indicate 100% completion, often additional work must be done after billing to remove the final temporary shoring materials.

Based upon all of the evidence and testimony submitted at trial, and as discussed above, the

Court finds that the work performed on October 3, 2008 was necessary for completion of the

contract and was also requested to be performed by Dunn.  Accordingly, the Court finds that the

indebtedness accrued on that date and the lien claim filed by Hayes was timely and should be

allowed.

### C.  Validity of Lien Claims of A2MG, Inc., S&W Waterproofing, Metro Tile and J.E. Dunn as to Materials Alleged to be Specially Fabricated for the West Edge Project

BBSSI objected to liens filed by claimants A2MG, Inc. ("A2MG"), S&W Waterproofing

("S&W"), Metro and Dunn as to materials alleged to be specially fabricated for the Project.

BBSSI does not dispute the amounts but contends that the materials are not "lienable" because

they were not delivered to or physically incorporated in the Project.

Pursuant to §429.010, a lien is allowed on property to secure payment to "any person who

shall do or perform any work or labor upon, or furnish any material, fixtures, engine, boiler or

machinery for any building, erection or improvements upon land...."  The general rule in Missouri

has been that in order for a materialman to have a mechanic's lien upon a particular structure for

materials, he is required to show that the materials 'actually entered' or 'went into' or were 'used

in' the construction of the building.  *See Bates County Redi-Mix, Inc. v. Windler*, 162 S.W.3d 98,

101-02 (Mo. Ct. App. 2005); *Kansas City Elec. Supply Co. v. Bomar Elec. Co., Inc.*, 581 S.W.2d

411, 413 (Mo. Ct. App. 1979); *Boyer Lumber, Inc. v. Blair*, 510 S.W.2d 738, 745 (Mo. Ct. App.

1974); *Davidson v. Fisher*, 258 S.W.2d 297, 301 (Mo. Ct. App. 1953); *Tallman Co. v. Villmer*, 133

S.W.2d 1085, 1087 (Mo. Ct. App. 1939)*; E.R. Darlington Lumber Co. v. Westlake Const. Co.*,

141 S.W. 931, 932 (Mo. Ct. App. 1911).  However, it is a long held principle of mechanic's lien

law that the lien statutes are remedial in nature and should be given a liberal construction as

13

favorably to materialmen as their terms permit. ; *Boyer Lumber*, 510 S.W.2d at 747; *Davidson*, 258 S.W.2d at 301.  Thus, courts have recognized that the general principle has its exceptions and have deviated from it in certain circumstances.

For instance, in *Darlington v. Westlake*, the court made the distinction that while the materials must enter into the construction of the building, they need not become a permanent part of the structure.  *Darlington v. Westlake*, 141 S.W. at 932.  The court found that where the material "is furnished and used accordingly, and is, either in whole or in part, consumed in its use, the materialman is entitled to a lien for the material thus consumed in the erection of the structure to the extent of the consumption of its reasonable value, regardless of the fact whether or not such material formed a permanent part of the structure when completed.  Consumption of value means the depreciation in the market value of the material by the use provided for by the contract." *Id.* at 933.  Thus, it held that the lumber used for concrete forms became substantially worthless after used and removed from the project, and that other parts greatly depreciated in value and were thus lienable items.  *Id.; see also, E.R. Darlington Lumber Co. v. Pottinger*, 147 S.W. 179 (Mo. Ct. App. 1912) (example of items that went into a structure but then came out include window frames and blinds which were delivered and set into the structure but later taken out by the owners); *Berkshire Lumber Co. v. J.S. Chick Inv. Co.*, 153 S.W. 1078, 1079 (Mo. Ct. App. 1913) (held where flooring was put into building but then torn out because not satisfactory to owners that loss should not be put upon materialman and allowed lien).

In *Hydraulic-Press Brick Co. v. Green*, 164 S.W. 250, 253 (Mo. Ct. App. 1914), the court allowed a lien for lumber used in temporary scaffolding and for brick materials that were "necessarily and reasonably wasted."  That court found that materials are "used" in the

14

construction of a building when they are reasonably consumed in the improvement, regardless

whether or not they are made an integral part of the permanent structure. *Id.*; *Tallman*, 133 S.W.2d

at 1088 (stating proposition that material need not be permanent part of structure).

In *Boyer Lumber,* the court found that paneling that was at the project but not incorporated

into the project and later burned was 'consumed' in the sense of being used or depreciated. It

stated that the materialman in good faith sold the materials for use in the construction, that the

materials either went into *or* were consumed *or* were depreciated in value, and that a liberal

construction of the lien statutes permitted a lien to be allowed. *Boyer Lumber*, 510 S.W.2d at

747(emphasis added). Likewise, in *Bates County Redi-Mix,* the court again noted the need for

liberal application of the mechanic's lien statute, and determined that where a materialman

provided concrete to a project that was installed but later completely removed that a lien should be

allowed. The court followed those cases that determined it is not essential that supplied materials

become a permanent part of the structure, nor even that they improve the value of the property.

*Bates County Redi-Mix*, 162 S.W.3d at 102-03.

All of these cases offer some guidance on the interpretation of the general rule and its

exceptions, but none specifically addresses whether an item can be considered as having been

"furnished" to a project if it was never delivered or incorporated but was so unique as to have no

other use. On that issue, the court in *Grainger & Co. v, Johnson*, 286 F. 833 (6th Cir. 1923)[4],

interpreted Kentucky's mechanic's lien statute which states "a person who performs labor or

---

[4] Missouri courts have warned of reliance on decisions of other states in interpreting Missouri's mechanic's lien law; however, such cases can be used for guidance if their mechanic's lien statues contain similar language as the language of Missouri's lien statutes. *See Missouri Land Development*, 269 S.W.3d at 503 (citing *Henry & Coatsworth Co. v. Evans*, 10 S.W. 868 (Mo. 1889)); *see also, Darlington Lumber Co. v. Westlake Const. Co.*, 141 S.W. 931, 932 (Mo. Ct. App. 1911)).

furnishes materials in the erection, altering or repairing a house, building or other structure, or for

any fixture or machinery therein, . . . shall have a lien thereon...."  That court determined that steel

structures manufactured specifically for a project and useless for any other project should be

considered to be "furnished" for the construction of the building.  As the court noted, a common

definition of "furnish" is "to provide for use" and it  concluded that to constitute a furnishing of

materials, actual incorporation in the building is not required.  *Id.* at 835-36 (citing *Braeckel v.*

*Shade*, 118 S.W. 1196 (Mo. Ct. App. 1909) for the proposition that mechanic's lien statutes are

highly remedial and should receive liberal construction).  In that case, the steel was provided for

use in the project, and for no other use; it had never been diverted from such use; had always been

held for such use; and was valueless for any other purpose.  *Grainger,* 286 F. at 835-36.

Accordingly, that court allowed a lien for the value of the material.

Similarly, the court in *Haskell v. McClintic-Marshall Co.*, 289 F. 405 (9th Cir. 1923),

answered the question whether material that is specially manufactured for a building but not used

in the construction or delivered supports a lien.  In that case, the court analyzed the Washington

state mechanic's lien statute which provided a lien for "[e]very person performing labor upon or

furnishing material to be used in construction...of any...building..."  *Id.* at 412.  It determined that

where material is manufactured and specially designed for a building that the material is

"furnished" as soon as prepared and ready for delivery.  *Id.* at 412-13.

The Court is mindful of the remedial nature of mechanic's lien law in Missouri, and that

the law's purpose is "to give security to mechanics and materialmen for labor and materials

*furnished* in improving the owner's property."  *R.L. Sweet Lumber Co. v. E.L. Lane, Inc.*, 513

S.W.2d 365, 371 (Mo. 1974) (emphasis added).  The dictionary defines "furnish" as to "supply,

provide, or equip with whatever is necessary or useful...."  Webster's New College Dictionary 575 (2005). The Sixth and Ninth Circuit cases discussed above determined that where material is manufactured and specially designed for a building that the material is "furnished" as soon as prepared and ready for delivery. *Haskell*, 289 F. at 412-13.  Although both cases are from other states' courts, the mechanic's lien statutes in both cases are similar to that of Missouri.  The Court also notes that the Uniform Construction Lien Act provides that "furnish" includes specially fabricated materials not physically incorporated into the project. *See* Uniform Construction Lien Act (U.L.A.), §204 (1987).

BBSSI relies on *Missouri Land Dev. Specialties, LLC v. Concord Excavating Co., LLC*, 269 S.W.3d 489 (Mo. Ct. App. 2005), to support its contention that liens for specially manufactured items that were not delivered to and/or installed in the project should not be allowed. In that case, a lien claimant sought a lien for equipment rental costs which covered a period when the equipment was not in use on the project.  The court determined that such costs were not lienable because the lien claimant was not performing a service during the shutdown time that provided a "benefit or improvement" to the property.  The court also noted the holdings of those cases that required the materials to have "actually entered" or that "went into" or were "used in" the construction of an improvement on the property. *Id.* at 505 (citing *Kansas City Elec. Supply Co. v. Bomar Elec. Co.*, 581 S.W.2d 411 (Mo. Ct. App. 1979); *Tallman Co. v. Villmer*, 133 S.W.2d 1085 (Mo. Ct. App. 1939); *Davidson v. Fisher*, 258 S.W.2d 297 (Mo. Ct. App. 1953)).  The problem with the reliance on *Missouri Land Development* is that the case dealt with idle equipment and not specially manufactured, unique material that could only be used on that specific project.  It also did not discuss the meaning of "to furnish" as it applies to such specially manufactured

17

material.  Further, other courts have held that improvement to the value of the property is not a

statutory element of a mechanic's lien claim.  *See Bates*, 162 S.W.3d at 103 (discussing *Shine's*

*Executrix v. Heimburger*, 60 Mo. App. 174 (Mo. Ct. App. 1939)).  BBSSI also relies on *Tallman*

for its assertion that the materials must have been incorporated into the project or at least added a

benefit or improvement to the property.  However, that court clearly made the distinction and

recognized that other courts had allowed lien claims where the materials were consumed or

depreciated in value by the use made of them.  *Tallman*, 113 S.W.2d at 1088.

### 1.    A2MG, Inc.

The sole issue as to A2MG has been narrowed to whether the disputed glasswork for the

project is lienable[5].  A2MG is involved in the specialized trade of glass glazing.  The parties have

stipulated that $352,633.60 of A2MG's charges were for material and labor that was delivered

and/or incorporated into the Project.  However, $349,284.00 worth of material and fabrication

labor were for finished materials procured or produced by A2MG and tendered to Dunn and

Trilogy pursuant to A2MG's subcontract, but not physically incorporated into the Project.

Mr. Wilson, the project manager, testified that the labor and materials at issue were all

specially fabricated and customized specifically for this project and could not be used on any other

job that A2MG has or anticipates having.  Because the material was customized for this project, it

cannot be returned or resold.  All of the custom material was delivered to and stored at a

warehouse of Dunn's because A2MG could not deliver it to the jobsite due to lack of space.  The

material could potentially be recycled but that cost would be more than the material is worth.  Mr.

---

[5]BBSSI also argued that A2MG did not itemize what materials actually entered into the building and which
did not.  However, the Court finds that it is not necessary in this instance to itemize what materials actually entered
the building in light of the Court's decision that all materials at issue- whether incorporated into the Project or not-
are lienable.

Edwards, VP for Dunn, also testified that the material from A2MG that Dunn is storing in its warehouse is custom and special to the Project, there is no other use for the material and that it will incur costs to dispose of it.

Courts have noted that one reason for the rule requiring incorporation into the improvement is to prevent contractors from fraudulently billing for materials used on other jobsites. *See, e.g., Haskell*, 289 F. at 412. According to the evidence, all of the specially fabricated material at issue with A2MG is in storage, and has not been used in any other project and could not be used in any other project. Thus, the fear of fraudulent or double billing is not an issue here.

The Court agrees with those cases discussed above that determined that material that did not go into a project but was "used or consumed" was lienable and finds that the specially manufactured items that can only be used for this Project were furnished to the project by A2MG and are analogous to the items in the cases discussed above that were depreciated and thus used or consumed in a project but not permanently incorporated into the real estate. In *Boyer Lumber*, the court found that the allegedly "nonlienable" items were "either consumed or used in the building or were so far depreciated in market value that they may legitimately be claimed as lienable items." *Boyer Lumber*, 510 S.W.2d at 747. Although the items with regard to A2MG were not delivered to the jobsite (due to space limitations), nor physically incorporated into the Project, these are not dispositive factors. The testimony shows that because of the specialized nature of the items at issue, those materials are so far depreciated in market value that they are actually worthless for resale or reuse. The Court also finds that based on the testimony, and applying the discussion above, the materials and labor at issue were indeed "furnished" to Dunn/Trilogy in that

they were provided to them for their use at the Project.[6]  Based on the foregoing discussion, the

Court finds that these materials which were custom to the Project and have no other use are

lienable and allows the lien for $349,284.00 worth of material and fabrication labor for finished

materials procured or produced by A2MG and tendered to Dunn and Trilogy pursuant to A2MG's

subcontract.

### 2.    S & W Waterproofing

The parties have stipulated to all of the following: that the sole factual dispute relates to the

four claim components (expansion joint material, custom colored caulk, elastomeric firestopping

material, and rigid insulation board) that encompass $141,089.45 worth of materials procured or

produced by S & W and tendered to Dunn and Trilogy pursuant to S & W's subcontract, but not

physically incorporated into the Project.  The materials were not diverted for other projects and all

materials are accounted for and in S & W's custody.  The expansion joint material, custom colored

caulk, elastomeric firestopping material, and rigid insulation board were delivered to the project

site and were being installed at the time the Project was terminated.

At the time of the termination of the Project, $11,406 worth of uninstalled components of

the expansion joint material remained; $19,056 of uninstalled custom colored caulk remained;

$14,017.60 of uninstalled elastomeric firestopping material remained; and $96,609.85 of

uninstalled rigid foam insulation board remained.  S&W has since stored all of the materials and

made reasonable efforts to sell or use the material but has been unable to do so and none of it can

be diverted to other jobs, sold, or restocked with the manufacturer.

---

[6]The Court notes there was some discussion as to whether these materials could still be used on the Project
but there was no evidence introduced that this is the case or that the current owner has any intention of purchasing
and using this material.

None of the material at issue has any current value because the shelf life has expired and none of it can be reused in another project.  The rubber gland material and elastomeric nosing material are components of the expansion joint material.  The rubber gland material was cut to a specified length for the project at the factory and rolled and shipped in sizes required by the project plans and specifications.  Each roll of rubber gland material has a shelf life and each bucket of elastomeric nosing material is marked with an expiration date.  The colored caulk is a custom color that is virtually never specified by architects for other projects and the manufacturer will not restock it. The rigid foam insulation board  is custom manufactured in a unique, one-of-a-kind foam product thickness and has never, to S&W's knowledge, been specified to this thickness in Kansas City or anywhere, and the manufacturer will not restock the material.  The manufacturers have indicated the expansion joint material, custom colored caulk, elastomeric firestopping material, and rigid insulation board should not be used.  Upon resolution of this case, all of the above materials will be discarded by S&W which will result in additional costs.

The same analysis as that provided above regarding A2MG is applicable to S & W (other than the fact that S&W actually delivered most of the materials to the jobsite, thus strengthening its argument that the materials were "furnished" to Trilogy).  The stipulated facts show that because of the specialized nature of the items at issue, those materials are so far depreciated in market value that they are actually worthless for resale or reuse and that the materials and labor at issue were indeed "furnished" in that they were provided to them for their use on the Project. Thus, the Court finds that these materials which were custom to the Project and have no other use are lienable and allows the lien for $141,089.45 worth of material and fabrication labor for finished materials procured or produced by S & W and tendered to Dunn and Trilogy pursuant to S & W's

21

subcontract.

### 3.      **Metro Tile**

As above, BBSSI objects to Metro's claim on the ground that it is based on materials that were never actually incorporated into the real estate or even delivered to the Project, and thus not lienable.[7] The parties submitted the facts on stipulation. Metro and Trilogy entered into a contract pursuant to which Metro was to order, obtain and install specific and unique items of marble, porcelain tile, glass mosaics and quartzite for installation in the Project. All of the materials to be obtained by Metro were via special orders from Greece, Italy and China and have been manufactured, formulated and cut to certain specifications such that the materials can only be used for this Project. Due to termination of the Project, Metro has been unable to deliver any of the materials to the jobsite and the materials are presently being stored in Kansas City and China and have never been stored at the jobsite. The contract between Metro and Trilogy provided that because the staging areas at the jobsite are extremely limited the materials may need to be properly stored off-site until needed on-site. All of the materials were specifically fabricated for the Project and are not resalable in the ordinary course of Metro's business.

The same analysis as that provided above regarding A2MG is applicable to Metro. Thus, the Court finds that these materials which were unique, one-of-a-kind and specially fabricated to this project and have no other use are lienable and allows the lien.

### 4.      **Dunn**

BBSSI contends that Dunn's lien "includes non-lienable items." This objection is the same

---

[7]BBSSI has also objected to Metro's claim because it failed to include the 10-point Notice per §429.012. That objection is ruled on in the part of this Opinion dealing with the Motion for Summary Judgment. BBSSI further objects to the priority of Metro's claim under §429.060 which is addressed in that section of this Opinion dealing with the priority issue.

as the objection to the subcontractors discussed above who provided specially fabricated materials

for the Project but which were not physically incorporated into the Project.  Thus, the Court's

analysis and finding regarding such specially fabricated materials is the same as that laid out above

and that portion of  Dunn's lien is allowed to the extent it is not duplicative of a subcontractor's

lien for the same items.

### D.  Validity of Lien Claim of E & K of Kansas City

E & K of Kansas City ("E & K") filed a mechanic's lien for labor and materials in the

amount of $457,231.25.  The lien statement contains some 200 pages of invoices and pay

applications, but raises some issues for what it does not contain or what is not clearly set forth in

the lien statement.  For example, the lien statement does not clearly identify the total amount due

for materials provided.  Although it does include a list of all materials by description and number

of units, unit prices are not supplied.  In addition, the statement includes pay applications for labor

costs which list the employees performing the work, describe the work performed and identify the

dates and hours worked and the applicable hourly rates.

BBSSI filed its report objecting to the lien statement of E & K for its failure to "among

other things" include unit prices.  E & K filed a motion to strike the objection asserting that

inclusion of unit prices was not necessary and that BBSSI should not be permitted to raise other

issues given its failure to specify them and its apparent attempt to reserve them in such general

language.  E & K argued that it would not have adequate notice of such claims and an opportunity

to contest them.

The Court considered the motion to strike, took all of the evidence subject to it and

ultimately overruled it, a decision it now affirms.  E & K is correct that the mere failure to list unit

23

prices does not affect the validity of a lien claim which otherwise complies with the statutory requirements. *Commercial Openings, Inc. v. Mathews*, 819 S.W.2d 347, 350 (Mo. 1991); *Bolivar Insulation Co. v. Bella Pointe Development, L.L.C.*, 166 S.W.3d 610, 613-614 (Mo. Ct. App. 2005); *S & R Builders and Suppliers, Inc. v. Marler*, 610 S.W.2d 690, 696-697, (Mo. Ct. App. 1980). Accordingly, to the extent BBSSI's objection is predicated upon the failure to include unit prices, it is overruled. Two things, however, became evident after listening to the testimony at trial and reviewing the lien statement. First, some of the other issues with the lien statement, such as the failure to include a figure for the total amount of materials delivered to the Project, were linked to E & K's failure to provide unit prices. Second, E & K's own evidentiary presentation indicated that it was aware of and prepared to defend these other issues. Because the additional issues raised were related to the failure to include unit prices and because E & K had fair notice of them and an opportunity to respond, the Court considers them on their merits. However, as noted below, BBSSI's objections are overruled and E & K's lien claim will be allowed in the amount filed.

The applicable statute requires an entity asserting a mechanic's lien to file a statement which includes a "just and true account." Unfortunately, the requirement is not further specified and the elements of a just and true account are not defined in the statute. Accordingly, the Court must consider whether the requirement has been met based on the circumstances of the particular case. *Unerstall Foundations, Inc. v. Corley*, 328 S.W.3d 305, 315 (Mo. Ct. App. 2010); *Missouri Land Development Specialties, L.L.C. v. Concord Excavating Co.*, 269 S.W.3d 489, 497 (Mo. Ct. App. 2008); *Glasco Electric Co. v. Best Electric Co.*, 751 S.W.2d 104, 108 (Mo. Ct. App. 1988); *S & R Builders*, 610 S.W.2d at 697. Although the statutory language applies to both, Missouri

courts have established different standards for contractors, who have a relationship with the owner, and subcontractors who do not. A general contractor can make a just and true account by stating a lump sum without itemization. A subcontractor, on the other hand, must include an itemized statement of the labor and materials furnished. The existence of a contract not only establishes some familiarity on the part of the owner with the project and the materials and labor supplied, but also affects the measure of recovery. The subcontractor's recovery is not based on the contract, but rather in quantum meruit. Accordingly, the subcontractor must demonstrate the reasonable value of the material and labor supplied; hence, the itemization requirement. *See Commercial Openings*, 819 S.W.2d at 350; *Grgic v. Cochran*, 740 S.W.2d 358, 360 (Mo. Ct. App. 1987); *Zundel v. Edge, Inc.*, 705 S.W.2d 113, 114 (Mo. Ct. App. 1986); *Wadsworth Homes, Inc. v. Woodridge Corporation*, 358 S.W.2d 288, 291 (Mo. Ct. App. 1962); *Mississippi Woodworking Co. v. Maher*, 273 S.W.2d 753, 755-756 (Mo. Ct. App. 1954). The purpose of the itemization requirement is to enable the owner to conduct an investigation to determine whether the materials were actually used in the construction of the project, whether they were lienable, and whether the amount charged is reasonable. *Commercial Openings*, 819 S.W.2d at 349; *Unerstall Foundations, Inc.*, 328 S.W.3d at 315; *Missouri Land Development Specialties*, 269 S.W.3d at 497; *Bolivar Insulation Co.,* 166 S.W.3d at 613; *S & R Builders*, 610 S.W.2d at 696; *Wadsworth Homes, Inc.*, 358 S.W.2d at 291; *Mississippi Woodworking Co.*, 273 S.W.2d at 756. While they have expressed it in different ways, the Missouri courts have made clear that a just and true account need not contain hypertechnical levels of detail. *Missouri Land Development Specialties*, 269 S.W.3d at 498 (not the object of the mechanic's lien law to create a rule of "literal exactitude" in the filing of lien accounts); *Woodling v. Westport Hotel Operating Co.*, 63 S.W.2d 207, 209 (Mo. Ct. App.

1933) ("it was not, however, the object of the statute to create a Procrustean rule of literal exactitude in the filing of lien accounts"); *Banner Lumber Co. v. Robson*, 168 S.W. 244, 245 (Mo. Ct. App. 1914) (unreasonable to expect as accurate and careful a statement of account as might be required of an attorney in bringing an action). The Missouri courts have also consistently applied to this requirement the same principle applied to other aspects of the mechanic's lien law, specifically that the mechanic's lien statute is remedial in nature, enacted to provide protection for those who make improvements to real property and should be as liberally construed as the circumstances allow. *Commercial Openings, Inc.*, 819 S.W.2d at 349; *Bolivar Insulation Co.*, 166 S.W.3d at 613; *Woodling*, 63 S.W.2d at 613; *Banner Lumber Co.*, 168 S.W. at 246. Accordingly, a substantial compliance with the statute's itemization requirements is sufficient. *Continental Electric Co. v. Ebco, Inc.*, 365 S.W.2d 746, 751 (Mo. Ct. App. 1963); *Woodling*, 63 S.W.2d at 209-10; *Banner Lumber Co.*, 168 S.W. at 245-46.

While the Court expressed reservations at trial about the lien statement, after more thoroughly considering the evidence, the arguments of E & K and the applicable law, the Court has determined that under the circumstances, the lien statement of E & K meets the statutory requirement that it constitutes a just and true account. As E & K argues in its brief, it is possible to determine the total amount claimed for materials, although it is not stated with specificity in the lien statement, by taking the total amount claimed and subtracting the amount for labor, which can be calculated based upon the pay applications and other evidence submitted. *See Unerstall Foundations*, 328 S.W.3d at 315 ("Unerstall did not disclose the labor rate for each employee but filed time sheet reports that detailed when and for how long each employee worked on the Corley job site, which is sufficiently specific to satisfy § 429.080."). Of critical importance is the fact that

E & K itemized all the material provided for the project.  The Missouri Supreme Court has indicated that even for the subcontractor "all that is required is that the lien statement 'advise the owner or the public of the total amount due and the nature of the materials furnished.'" *Commercial Openings*, 819 S.W.2d at 350 (quoting *Glasco Electric Co. v. Best Electric Co.*, 751 S.W.2d at 108).  In that case, the court found that an itemized list of the materials, along with a lump sum total was sufficient to satisfy the just and true account requirement.  As a matter of fact, the court held that as long as the contractor identifies the furnished material, the owner is necessarily provided with sufficient information to undertake an investigation to determine whether the material was provided to the project, was lienable and whether the amount claimed was reasonable.  *Id.*  In this instance, E & K provided a complete list of the materials included, with descriptions and numbers of units, and the total amount claimed for  materials is ascertainable from the information provided in the lien statement.

At trial, it became apparent that the lien statement includes all materials provided on the project and not just those for which E & K remained unpaid.  BBSSI claims that the inclusion of this additional material vitiates the lien.  Missouri law is to the contrary.  Missouri courts have consistently held that the inclusion in the lien statement of non-lienable materials does not invalidate the lien absent evidence that these materials were included in bad faith.  *Missouri Land Development Specialties*, 269 S.W.3d at 499; *Glasco Electric Co.*, 751 S.W.2d at 108-9; *S & R Builders*, 610 S.W.2d at 697.  There is no evidence in this record from which this Court could find that E & K acted in bad faith in including these additional materials in the lien statement.

Just as persuasive to this Court is E & K's argument that under the circumstances of this case it should be held to a less exacting standard than that traditionally imposed upon the

subcontractor.  E & K argues that it is essentially in the position of a general contractor because it had a contract with the owner.  E & K originally contracted with Dunn, which was at that time the general contractor, in order to supply labor and materials for the project.  After Dunn ceased work on the project, however, E & K's subcontract with Dunn was assigned to or ratified by Trilogy.  As a result, E & K had a direct contractual relationship with the owner and the owner was familiar with and endorsed the nature of the work to be done by E & K.  This approach is not without precedent in the Missouri case law.  For example, in *Hilliker v. Francisco*, 65 Mo. 598 (1877), the court held sufficient a lien statement by a subcontractor which merely referenced the contract and included a lump sum amount.  It justified the result on the basis that under the circumstances the evidence showed that the owner was aware of the terms of the contract between the claimant and the contractor and had agreed to the sum to be paid to the lien claimant.  Although the validity of the decision has been questioned (*see Rude v. Mitchell*, 11 S.W. 225 ( Mo. 1889), which described the holding as "going to the verge of law,") it has been affirmed and applied in other instances as noted by the court in *State ex rel. St. Francois County Building & Loan Association v. Reynolds*, 232 S.W. 1035, 1037 (Mo. 1921).  More recently, the rule was applied in *Wadsworth Homes, Inc. v. Woodridge Corporation*, 358 S.W.2d 288 (Mo. Ct. App. 1962) in which the issue was the sufficiency of a lien statement filed by a supplier of prefabricated houses.  In response to the contention that the lien statement did not satisfy the just and true account requirement as applied to liens filed by subcontractors, the lien creditor contended that it should have the validity of its statement measured by the rule applying to a lien claimant who was an original contractor with a lump sum contract with the owner.  The appellate court agreed noting that at the time the contract was entered into, the general contractor was the owner of the land.  *Wadsworth*, 358 S.W.2d at

28

292-93.  As noted above, a similar situation exists here.

Finally, BBSSI noted that the amounts set forth in the lien statement were based on the

contract schedule of values rather than the value of the particular labor and materials supplied.

First, if the analogy above is apt, the point would not be relevant as E & K would be entitled to

recover on the contract.  Second, however, even if the appropriate standard of recovery is quantum

meruit with the resulting itemization requirement, the Court concludes that the itemization is

sufficient.  Missouri courts have held that the amount stated in the contract is at least presumptive

as to the value of the materials made and may be relied upon absent contrary evidence.  *Rude*, 11

S.W. at 226.  There is no evidence here that the materials supplied did not have a value equivalent

to the appropriate contract schedule of values.

For all these reasons, the Court overrules the objections asserted by BBSSI to the lien

statement and claim form filed by E & K.

### E.  <u>Validity of Claim of Gould Evans –</u>

### 1.  <u>§546(b) Notice Issue</u>

The facts cited in this section of the opinion were stipulated to by the parties.  Defendant

Gould Evans Associates, LC ("Gould Evans") was the architect for the Project.  The relationship

between the Debtor and Gould Evans was governed by an agreement dated November 11, 2005

and amended in 2008.  Gould Evans provided a variety of services and billed Trilogy on a regular

basis.  Many of the invoices were unpaid.  Trilogy filed its Chapter 11 petition on May 15, 2009.

On May 20, 2009, Gould Evans filed a Statement of Mechanic's Lien against the Project in the

Circuit Court of Jackson County, Missouri for $821,153.53 (the "Mechanic's Lien").

BBSSI objects to the validity of Gould Evans' Mechanic's Lien on two grounds: that the

lien "ceased to exist" because Gould Evans failed to enforce it in a timely manner or file a proper

notice in the bankruptcy proceeding, and that arbitration services may not form the basis of a

mechanic's lien. [8]  It is undisputed that Gould Evans did not file a timely  action pursuant to Mo.

Rev. Stat. §429.170, nor did it file a Notice of Continued Perfection in the bankruptcy case under

11 U.S.C. §546(b).  BBSSI asserts that Gould Evans' claim is barred as a result.  Gould Evans

responds that 11 U.S.C. §108(c) tolls the six-month statute of limitations to file suit to enforce a

mechanic's lien and thus, §546(b) is not applicable.  For the reasons stated below, the Court agrees

and rules in favor of Gould Evans.

On the date of a debtor's bankruptcy filing, §362(a)(4) stays "any act to create, perfect, or

enforce any lien against property of the estate."   However, §362(b)(3) excepts from the

application of the stay "any act to perfect an interest in property to the extent that the trustee's

rights and powers are subject to such perfection under section 546(b) of this title...."  Section

546(b) limits a trustee's avoidance powers if generally applicable law "permits perfection of an

interest in property to be effective against an entity that acquires rights in such property before the

date of perfection."  If such law requires that an action be commenced to perfect the security

interest and that action was not taken before the bankruptcy filing, the interest is perfected by

postpetition notice.  11 U.S.C. §546(b). The exception contained in this provision provides

protection for statutory lienholders who are permitted, under applicable state law, "a grace period

for perfection which would necessarily relate back to a time before the bankruptcy" to defeat the

rights of an intervening creditor.  *In re Allgeier & Dyer, Inc.* 18 B.R. 82, 88 (Bankr. W.D. Ky.

1982).

---

[8]The issue of the lienability of the arbitration services is addressed in the next section of this opinion.

Because §362(a)(4) stays the filing of an enforcement action, Bankruptcy Code section 108(c) tolls the period in which it must be filed:

> ... if applicable nonbankruptcy law... fixes a period for commencing or continuing a civil action in a court other than a bankruptcy court on a claim against the debtor...and such period has not expired before the date of the filing of the petition, then such period does not expire until the later of –
>
> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
> (2) 30 days after notice of the termination or expiration of the stay under section 362, 922, 1201, or 1301 of this title, as the case may be, with respect to such claim.

11 U.S.C. §108(c).

The "generally applicable law" to be applied in this case is Missouri's mechanic's lien law which is governed by Chapter 429 of the Missouri statutes.  Section 429.010 provides in essence that any person who furnishes materials for a building or improvements upon land by virtue of a contract with the owner or proprietor shall have a lien on such building or improvements and on the land.   Under the Missouri lien law, there are two statutes of limitations with which a claimant must comply.  First, Mo. Rev. Stat. §429.080 provides the deadline for filing the lien:

> [i]t shall be the duty of every original contractor,...and every other person seeking to obtain the benefit of the provisions of sections 429.010 to 429.340, within six months after the indebtedness shall have accrued...to file with the clerk of the circuit court of the proper county a just and true account of the demand due him or them after all just credits have been given, which is to be a lien upon such building or other improvements...."

As noted above, the date the "indebtedness shall have accrued" is the last day work was performed or when the materials supplied are finally furnished.   *Midwest Floor Co.*, 304 S.W.3d at 247.

Next, § 429.170 states that an action to *enforce* the mechanic's lien must commence within six

months after filing the lien.  An action is "commenced within the statute by the filing of a petition

and the issuance of the summons."  *J.H. Berra Paving Co., Inc. v. City of Eureka*, 50 S.W.3d 358,

361 (Mo. Ct. App. 2001)(citations omitted).

The narrow issue before the Court involves the interplay between state lien law and federal

bankruptcy law.  Its resolution turns on whether or not the institution of a suit to enforce a

mechanic's lien under state law is part of the perfection process.  The court in the recent case of *In*

*re Miller*, 444 B.R. 177 (Bankr. E.D. Ark. 2011), said it best:

> The question becomes, is commencement of the enforcement action
> part of the perfection process.  If it is part of the perfection process,
> the action is not stayed pursuant to 11 U.S.C. §362(b)(3) and
> pursuant to §546(b) [the lienholder] was required to give notice.  If
> the enforcement action is not part of the perfection process, then 11
> U.S.C. §362(a)(4) stays the act and §108(c) applies, thereby tolling
> the action.

*Id.* at 180-81.

Numerous courts have made the distinction between the act of perfecting the lien and the

act of enforcing it.  *See, e.g., McGonigle v. Foutch*, 51 F.2d 455 (8th Cir. 1931)(recognizing the

difference between filing a lien account as a step to perfection and taking an equitable action to

ensure that the liens are satisfied); *In re Premier Hotel Development Group*, 270 B.R. 234, 242

(Bankr. E.D. Tenn. 2001)("Acts to enforce a lien, in contrast to the perfection actions which fall

within 11 U.S.C. §546(b), are stayed by the bankruptcy filing and, thus, any time periods for

enforcement are tolled by §108(c) of the Bankruptcy Code."); *In re Richardson Builders, Inc.,* 123

B.R. 736, 739 (Bankr. W.D. Va. 1990)("[I]n Virginia, the recording of a memorandum of lien does

not violate the stay imposed by Section 362(a), while the filing or prosecution of an enforcement

action...does do so."); *In re Orndorff Construction, Inc*., 394 B.R. 372 (Bankr. M.D.N.C.

2008)(whether a creditor must give §546(b) notice depends on whether filing an enforcement action is required to perfect a lien under state law).   Gould Evans relies on three Missouri cases in support of its position that the requirement to provide postpetition notice was negated by §§362(a) and 108(c).  The Court will examine each of them in turn.

In *In re Houts*, 23 B.R. 705 (Bankr. W.D. Mo. 1982), the debtors purchased construction materials from the plaintiff; the last purchase was on or about January 30, 1982.  The debtors filed their Chapter 7 petition on March 10, 1982.  The plaintiff filed its mechanic's lien in the circuit court during the week of May 17, 1982, and moved for relief from the automatic stay the following week.  Before obtaining a ruling, the plaintiff filed its suit to enforce the lien.  A hearing was held to determine if the plaintiff should be held in contempt for violating the stay.  Relying on the language of the relevant lien statutes and Missouri law construing it, the *Houts* court distinguished between perfection and enforcement:

> The filing [of a lien] does not create the lien; it gives notice of the previous existence of the lien and perfects it.  This filing is contemplated by the Code and is an exception to the automatic stay.  But plaintiff here did more than perfect its lien.  It also attempted to enforce it by the filing of a suit while debtors were in bankruptcy.

*Id*. at 707.  Thus, the court held that the "[p]laintiff did not violate the automatic stay by perfecting its lien; it did violate the stay by filing suit to enforce it." *Id.*  The court noted that even if the plaintiff argued that the filing of the suit was necessary to avoid the running of the statute of limitations under §429.170, it would not prevail because "the filing of the bankruptcy tolls any such statute of limitations." *Id.*, citing 11 U.S.C. §108(c).

In *Major Lumber Company, Inc. v. G & B Remodeling, Inc.*, 817 S.W.2d 474 (Mo. Ct. App. 1991), the Missouri Court of Appeals addressed the following issue:   When a debtor's

33

Chapter 11 petition for relief is filed *after* a creditor's statement of mechanic's lien, does the

pendency of the federal bankruptcy proceeding extend the state's six month statute of limitations

for enforcing a mechanic's lien for an equivalent time once the automatic stay is lifted?  The

chronology of events is significant --

> April 24 – creditor filed a Notice of Intent to File Mechanic's Lien;

> May 10 – creditor filed a Statement of Mechanic's Lien (Missouri statute begins to run);

> May 11 – Debtor filed bankruptcy;

> August 30 – creditor filed a motion for relief from stay;

> September 25 – bankruptcy court entered an order lifting the stay;

> November 10 – end of six-month limitation period to enforce mechanic's lien;

> November 15 – creditor filed a Petition for Enforcement of Mechanic's Lien.

*Id.* at 475.    A bank defendant and the trustee moved to dismiss the creditor's lawsuit on the

grounds that the bankruptcy filing did not toll the limitations period for enforcing a mechanic's

lien (as set out in § 429.170 R.S.Mo.) and thus, Missouri's six-month statute of limitations had

expired.   Their primary argument was that §108(c) is triggered only when the state has a particular

statutory scheme providing for the suspension of a limitations period.  The court rejected the

argument that §108(c) had such a narrow application and held that the provision operated to toll

the time prescribed for enforcing a lien while the automatic stay was in effect.  *Id.* at 478.

The third case cited by Gould Evans is *Sachs Electric Company v. HS Construction Co.*, 86

S.W.3d 445 (Mo. Ct. App. 2002).  The creditor in that case filed a mechanic's lien against the

property owner approximately one month after an involuntary bankruptcy proceeding was  filed

against the general contractor.  Nearly ten months later, the bankruptcy court lifted the stay and the

creditor filed a petition against the owner seeking to recover the amount due for his unpaid work.

The circuit court dismissed the mechanic's lien claim for untimeliness, stating as follows:

> By the plain terms of Section 429.170, RSMo 2000, [the creditor]
> was obliged to file its action with[in] six months after filing notice of
> lien with the Circuit Clerk.  Although HS [Construction] may have
> been a necessary party to such an action, it does not follow that the
> bankruptcy stay tolled the statute of limitations as to [the owner].

*Id.* at 449.  The creditor appealed.  Relying on *Major Lumber*, *supra*, the creditor asserted that the

stay in effect when the general contractor's bankruptcy was filed tolled the six-month period for

filing a mechanic's lien lawsuit against the owner.  Because the general contractor was a necessary

party to the lawsuit, the creditor could not have pursued a claim against it during the pendency of

the automatic stay.  *Id.* at 450.  The Missouri Court of Appeals agreed, finding that the *Major*

*Lumber* decision resolved the appeal:

> Here there is no dispute that the automatic stay of 11 U.S.C. Section
> 362(a) went into effect when [the general contractor's] bankruptcy
> was filed on January 18, 1999, and that it was not lifted with respect
> to [the creditor's] claims until December 12, 2000.  In accordance
> with the *Major Lumber* decision, [the creditor's] period for filing a
> mechanic's lien action did not commence until the stay was lifted on
> December 12, 2000. [The creditor] filed the mechanic's lien action
> against [the owner] within nine days of the lifting of the stay.  That
> action was timely filed.

*Id.* at 450-51.

BBSSI asserts that the three cases on which Gould Evans relies are inapplicable.

Specifically, BBSSI points out that, unlike the present situation, these cases involve whether a

lawsuit to enforce a mechanic's lien was properly or timely filed.  This is a distinction without a

difference.  The cases are indeed relevant insofar as they accurately state the mechanic's lien law

in Missouri and analyze how that law "interacts" with the pertinent bankruptcy provisions.  Since

the disposition of this matter is governed by Missouri law, this Court finds the cases cited by Gould Evans to be persuasive authority.  The facts underlying the cases may differ from those of this case, but taken together, the cases indicate that filing suit is an act to enforce a mechanic's lien, enforcement actions are stayed upon the bankruptcy filing, and the statute of limitations prescribed by §429.170 is tolled.

BBSSI relies on *In re Baldwin Builders, Village Nurseries v. David Gould*, 232 B.R. 406 (B.A.P. 9th Cir. 1999), to support its blanket statement that compliance with the §546(b) notice requirement is the only means by which a lien claimant can perfect its mechanic's lien in bankruptcy.  The holding in that case, however, is not controlling – it is based entirely on California's mechanic's lien law which differs significantly from Missouri law.   Furthermore, the tolling issue under §108(c) was not addressed.  The claimant in *Baldwin* recorded a mechanic's lien against the debtor's real property before the debtor's bankruptcy filing.  The claimant filed a foreclosure action on the lien postpetition, but did not serve the complaint or otherwise pursue the lawsuit.  The trustee questioned the validity of the lien.  The bankruptcy court  found that the foreclosure complaints were void as violations of the stay and that the §546(b) notice requirement had not been satisfied. The Ninth Circuit Bankruptcy Appellate Panel affirmed because "[u]nder California law, the filing of a foreclosure suit, an enforcement action, is required to maintain the perfection of a lien: if no suit is timely filed, the lien becomes void." *Id.* at 411.  In contrast, the filing of a foreclosure suit is not required to perfect a mechanic's lien under Missouri law.

BBSSI also relies on *In re Birdview Satellite Communications, Inc.*, 90 B.R. 465 (Bankr. D. Kan**.** 1988), to support its position that the Defendant's failure to file a §546(b) notice is fatal.  Again, that case is irrelevant  inasmuch as it applies Kansas law, not Missouri law.  The issue

36

decided by the court was whether, under Kansas law, a mechanic's lien is fully perfected upon the

filing of the verified lien statement or whether commencement of a foreclosure action is also

necessary to perfect. Based on the Kansas cases construing the relevant Kansas statutes, the court

concluded that "the bringing of an action to foreclose a mechanic's lien within one year of the

filing of the lien statement is a necessary step for perfection of a mechanic's lien under *Kansas*

law," and held that the claimant's lien had expired. *Id.* at 470 (emphasis added). The court also

addressed the parties' dispute over the effect to be given a Kansas statute providing that "[a]n

action to foreclose a lien under this article shall be brought within one year from the time of filing

the lien statement..." Kan. Stat. Ann. § 60-1105(a). The claimant asserted that this provision was

not a requirement for perfection of the mechanic's lien, but only a statute of limitation. The bank

claiming a superior lien urged that it was a statute of duration, and thus an enforcement action was

a necessary step to perfect. The court noted the distinction:

> A statute of limitation operates to extinguish the ability to enforce
> the claim but not to extinguish the claim itself. The limitation in a
> statute of duration, however, 'is a condition imposed upon the
> exercise of the right of action granted,' such that when the limitation
> expires, so too does the right.

*Birdview*, 90 B.R. at 467 (citations omitted). Based on cases interpreting the Kansas lien law, the

court concluded that § 60-1105(a) operates as a statute of duration. The Missouri statutes do not.

As discussed previously, Missouri courts have consistently characterized Mo. Rev. Stat. § 429.170

as a statute of limitation. *See, e.g., J.H. Berra Paving*, 50 S.W.3d at 361 ("Under chapter 429,

there are two statutes of limitation that a claimant must comply with in order to perfect its

mechanic's lien, section 429.080 and section 429.170."). Although the Missouri statute imposes a

time limitation for bringing an action to enforce a mechanic's lien, it does not follow that the

37

failure to do so within that time frame extinguishes the lien (*i.e.*, the time restriction is not an essential element of the claim).   Instead, the time restriction is a procedural aspect that can be extended or tolled.

As noted at the outset, the key question in this case is whether, under Missouri law, an enforcement action is part of the perfection process.  The Court finds that it is not. Based on Missouri's mechanic's lien statutes and the cases construing them –  the only relevant authority – the act of enforcing a mechanic's lien is distinct from the act of perfecting the lien.  Therefore, § 362(a)(4) stayed any efforts on Gould Evans' part to enforce its mechanic's lien.  Section 108(c) tolled the period in which the enforcement action had to be filed, and as a result, there was no need for Gould Evans to file a §546(b) notice.[9]  Accordingly, BBSSI's objection to the validity of Gould Evans' mechanic's lien claim is overruled.

## 2.  Gould Evans – Arbitration Services Issue

The facts recited in this section of the opinion have also been stipulated to by the parties. The Owner-Architect Agreement Amendment dated October 3, 2008, provides that "Additional Services as requested or approved in advance for Arbitration Assistance after August 31, 2008 will be compensated on an hourly basis...."  Gould Evans is seeking a total of $16,969 for "assistance with arbitration proceedings" fees that accrued between September 1, 2008 and March 31, 2009, with regard to the Project.  Specifically, Gould Evans consulted with Trilogy, in preparation for Trilogy's arbitration with Dunn, to determine whether the contractors had complied with the architectural requirements (*e.g.*, landscape design, mechanical) and what needed to be done to complete the project.

---

[9]Because the Court finds that the Defendant was not required to give notice under §546(b), it  need not address the sufficiency of that notice.

BBSSI objects to the validity of that portion of Gould Evans' lien claim, asserting that arbitration services are not within the scope of services provided by architects that can form the basis of a mechanic's lien claim. Gould Evans argues that the work was covered by the Owner-Architect Agreement Amendment, and thus, is a valid component of its claim. For the reasons stated herein, the Court sustains BBSSI's objection.

The Missouri statutes govern liens for services specifically related to architecture, professional engineering, land surveys or landscape architecture:

> Every registered architect or corporation registered to practice architecture...who does any ...architectural work upon or performs any...architectural...service *directly connected with the erection or repair of any building or other improvement upon land* under or by virtue of any contract with the owner or lessee thereof...shall have for such person's ...architectural ...work or service so done or performed, a lien upon the building or other improvements and upon the land belonging to the owner or lessee on which the building or improvements are situated....

Mo. Rev. Stat. §429.015(emphasis added). Section 429.015 grants to registered architects a statutory lien generically equivalent to the mechanic's lien. *Energy Masters Corporation v. Fulson*, 839 S.W.2d 665, 668 (Mo. Ct. App. 1992)(citations omitted).

The Court recognizes that statutory liens such as those for mechanics or architects are remedial in nature and are to be construed liberally in favor of the claimant. *Maran-Cooke, Inc. v. Purler Excavating, Inc.*, 585 S.W.2d 38, 40 (Mo. 1979). However, the primary rule of statutory construction is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words used in their plain and ordinary meaning. *Wolff Shoe Co. v. Director of Revenue*, 762 S.W.2d 29, 31 (Mo. 1988). The statutory language of §429.015 is unambiguous – the services underlying the lien must be "directly connected with the erection or repair" to the building or improvements on the land. As stated by the court in

*Brownstein v. Rhomberg-Haglin and Assoc., Inc.*, 824 S.W.2d 13 (Mo. 1992): "To hold that

§429.015.1 allows an architectural lien to attach where the services of an architect are not

employed in 'erection or repair of any building or other improvement' would fly against the plain

meaning of the statute's terms." *Brownstein*, 824 S.W.2d at 16.

Although not precisely on point, the *Brownstein* case is informative. There, the Supreme

Court of Missouri relied on the legislative history of the general mechanic's lien statute to decide

whether an architect's plans must be used in the construction of the building in order for the

architect's lien to attach. It began with the rationale supporting a mechanic's lien: "it is reasonable

to grant the materialman or worker a lien on the real estate that roughly parallels his contribution

to the increase in value created by the improvement to the real estate." *Id.* at 19. Thus, the

material or services giving rise to the mechanic's lien "must be traceable into the property or, at

least, have been consumed in connection with the construction of the improvement to the real

estate." *Id.* The court then drew the parallel between Missouri's general mechanic's lien statute

and its specialized mechanic's lien statute for architects:

> ...[I]t is reasonable to apply the same type of requirement to §429.015 by requiring
> that the plans and specifications prepared by the architect that give rise to the
> unpaid account for which the architects' lien is claimed have been used in the
> construction or improvement of the real estate subjected to the lien. As with the
> general mechanics' and materialmen's lien statute, this insures that the services that
> give rise to the lien in fact resulted in an improvement and increased value in the
> real estate to which the lien attaches. The rationale that supports this type of
> requirement under §429.010, the general mechanics' and materialmen's lien statute,
> likewise supports a similar requirement under §429.015....

*Id.* Accordingly, the court affirmed the judgment of the trial court disallowing an architectural lien

to attach when the services were not "directly connected" to the erection or repair of the building.

In support of its objection to the portion of Gould Evans' lien claim attributable to

arbitration services, BBSSI cites the Florida case of *Robert M. Swedroe, Architect/Planners,*

*A.I.A., P.A. v. First American Investment Corp.*, 565 So.2d 349 (Fla. Dist. Ct. App. 1990). The

architects in that case prepared for and gave expert testimony with regard to pending arbitration

between the property owner and its general contractor. These additional services were performed

at the owner's request. In resolving the issue of whether providing testimony was a service

properly subject to a lien, the *Swedroe* court began with Florida's mechanic's lien statute:

> (1) Any person who performs services as architect...shall have a lien on the real
> property improved for any money that shall be owing to him for his services in
> preparing plans, specifications, or drawings used in connection with improving the
> real property or for his services in supervising any portion of the work of improving
> the real property....
>
> (2) Any architect...who has a direct contract and who ...shall perform services...in
> connection with a specific parcel of real property...shall have a lien upon such real
> property for the money owing to him or her..., regardless of whether such real
> property is actually improved.

FLA. STAT. §713.03 (1987). The court found that the expert witness services were performed

under the "Additional Services" provisions of the underlying contract. Nevertheless, the court

held that such services were not entitled to the protection of a lien on the real property:

> Although it was contemplated that the expert witness testimony would expedite
> clearing the property for its intended use, such services were not related to
> improvement of real property within the intent of section 713.03(1)....[T]he
> professional services which would support such lien are those services directed to
> the ultimate improvement of the subject real property. In contrast, the expert
> witness services at issue in this case were related to protection of ownership
> interests.

*Swedroe*, 565 So.2d at 353-54.

While this Court acknowledges that the sole authority cited by BBSSI is based on Florida

law, it finds the case persuasive. The Florida statute conditions the lien on services used "in

connection with improving the real property." Similarly, Missouri's statute conditions the lien on

39

services  "directly connected with the erection or repair of any building or other improvement upon land."  The rationale is the same – where services related to the improvement of real estate have been contributed, the professional providing those services should be granted a lien on the real estate that reflects his contribution to the resulting increase in value.[10]

In this case, Gould Evans' arbitration services may in fact have been performed pursuant to the amendment to the Owner-Architect Agreement, but that fact alone does not make the services lienable as Gould Evans suggests.  The plain language of the Missouri statute requires a direct connection with construction or improvements.  Here, the arbitration services had no connection whatsoever with the Project; rather, they were intended to assist in the arbitration between Trilogy and Dunn.   For those reasons, the Court sustains BBSSI's objection and holds that the portion of Gould Evans' lien claim attributable to arbitration services is invalid.

## IV.  MEMORANDUM OPINION DENYING OBJECTIONS BY BBSSI TO MECHANIC'S LIEN CLAIM FILED BY J.E. DUNN

The report filed by BBSSI also contains objections to the mechanic's lien filed by Dunn in the amount of approximately $12,445,963.46.  There are apparently five bases for the objection. One of them, whether Dunn complied with the requirement in Mo. Rev. Stat. § 429.012 of providing a particular form of notice to the owner of the project, has already been ruled by the Court in connection with Trilogy's motion for summary judgment joined in by BBSSI.  BBSSI also objects that the amount claimed by Dunn duplicates amounts claimed by certain of its subcontractors based on liens they have filed in the proceeding.  Dunn admits that and recognizes

---

[10]To the extent that this holding appears to be inconsistent with other conclusions drawn in this opinion (*e.g.*, the lienability of materials that were not incorporated into the Project), the Court notes that there is no inconsistency – this issue is governed by the specific language of the statute pertaining specifically to liens for architectural services as referenced above.

that its claim must be reduced accordingly to reflect the amounts of allowed claims held by its subcontractors. Those calculations will be made and appropriate credit given in connection with settling a final order in this matter. BBSSI also objects that the claim of Dunn includes certain matters which are not lienable. No specificity is given in support of this objection. The Court assumes, as does Dunn, that the objection relates to amounts included in Dunn's lien for materials not installed on the project, but which were specially manufactured. This issue is dealt with separately in that part of the opinion in which the Court determines that these amounts are in fact lienable under Missouri law.

The Court now turns to BBSSI's two remaining objections to Dunn's lien claim. First, BBSSI contends that Dunn waived the right to assert a mechanic's lien as a result of a Contract Amendment pursuant to which Dunn and Trilogy agreed to submit their disputes to arbitration. BBSSI claims that pursuant to that amendment, an arbitration proceeding was Dunn's sole remedy and it lacks the right to file and enforce a mechanic's lien claim. Second, BBSSI contends Trilogy and Dunn abandoned the contract they initially entered into and that as a result, Dunn has not satisfied the requirement in Mo. Rev. Stat. § 429.012 that Dunn's work have been performed under and by virtue of a contract. The argument is predicated on the finding of the arbitrators that the contract was abandoned and the fact they made their award to Dunn under principles of quantum meruit.

As a preliminary matter, Dunn asserts that BBSSI is estopped to argue that Dunn lacked the requisite contract with the Debtor as a result of its previously having taken the position in this proceeding that Dunn failed to comply with the notice requirement for asserting a mechanic's lien imposed by Missouri statutes on an original contractor. Dunn contends that in the course of that

41

argument, BBSSI affirmatively argued that Dunn was an original contractor with a contract with the Debtor who was required to issue notice in the form required by the statute. Dunn contends that position is contradictory to the one now asserted by BBSSI which is that Dunn performed its services without such a contract and is therefore not eligible to claim a lien. The Court disagrees and rejects the argument that BBSSI should be estopped from asserting its objections to Dunn's mechanic's lien claim.

As Dunn suggests, the doctrine of judicial estoppel is designed to protect the integrity of the judicial process. It prevents a litigant from taking a position in litigation when it has previously taken a contrary position and obtained some benefit by inducing the court to act on its claim. *See Hossaini v. Western Missouri Medical Center*, 140 F. 3d 1140, 1142-1143 (8th Cir. 1998).[11] The Court concludes that neither requisite for the application of the doctrine of judicial estoppel is present here. First, Dunn misconstrues BBSSI's argument. BBSSI does not contend that Dunn never had a contract. Rather, it argues that while Dunn and Trilogy initially had a contract, the contract was determined to have been abandoned and that services and materials for which Dunn now claims a lien were provided subsequent to that abandonment and not pursuant to the contract. Secondly, the Court does not agree with Dunn's characterization of BBSSI's previous position. BBSSI never affirmatively argued that Dunn was an original contractor. It simply argued that if it was, as Dunn contended, then it had an obligation to provide a particular form of notice to Trilogy in order to have a valid mechanic's lien and that it failed to do so. It argued then that if Dunn was an original contractor, it was required to provide the notice. It argues

---

[11]Without choosing between views, the *Hossaini* court notes that the majority view is that the doctrine applies only where the inconsistent prior assertion was adopted by the court in the earlier litigation while under the minority view, it applies even if the court has not. This Court adopts the majority view.

now that if Dunn was not an original contractor by reason of having abandoned the contract and

claims under the doctrine of quantum meruit, it is not eligible for a lien for a different reason.

Accordingly, in the Court's view, BBSSI was simply arguing in the alternative.  While the Court

ultimately rejects BBSSI's objections, it does not believe that BBSSI has taken contrary positions.

Finally, and just as important, the doctrine of judicial estoppel applies only if the litigant to be

estopped has obtained some benefit as a result of its previous contrary assertion.  That is, it applies

only if the Court has been induced to act on the basis of that contrary position.  In this case, that

has not happened.  As a matter of fact, the Court rejected BBSSI's prior argument that the notice

requirement imposed upon an original contractor had not been satisfied by Dunn.  The Court

denied the motion for summary judgment filed by Trilogy and joined by BBSSI based on that

position.  Accordingly, one of the elements for the application of the doctrine is absent.

### A. <u>Dunn Did Not Waive Its Right to Assert a Mechanic's Lien</u>

BBSSI argues that Dunn waived its right to assert a mechanic's lien by reason of a

Contract Amendment entered into between Trilogy and Dunn on August 12, 2007, which contains

provisions requiring the parties to submit their disputes to arbitration.  Disputes between Trilogy

and Dunn with regard to their contract led Dunn to announce that it was demobilizing and to file a

declaratory action in the Circuit Court of Jackson County, Missouri, requesting a determination

that it was not contractually obligated to perform on design package 4 on the project without an

agreement with regard to the cost and schedule for that work.  Trilogy responded by requesting an

injunction ordering Dunn to perform.  Trilogy obtained a temporary restraining order and a hearing

was scheduled on a preliminary injunction.  The day before the scheduled preliminary injunction

hearing, the parties entered into a Contract Amendment involving the provisions cited by BBSSI

with regard to arbitration of their disputes.  In particular, Section I of the agreement deletes

paragraph 4.4 of the contract (which apparently related to litigation of claims between the parties)

and replaced it with a provision on arbitration, including paragraph 4.4.1 entitled "Agreement to

Arbitrate" which requires, among other things that "the parties shall submit any and all claims or

disputes relating to or arising out of the Contract to binding arbitration as described herein."

BBSSI also relies upon a portion of paragraph 3.b. of the Contract Amendment entitled

"Reservation of Rights" which contains the following language:  "Contractor and Owner expressly

reserve for arbitration, as provided above, all rights with respect to the Contract."  BBSSI argues

that by agreeing to submit all their disputes to arbitration, Dunn forfeited the right to use the

mechanic's lien process provided by Missouri statutes.

Dunn points to certain other provisions of the Contract Amendment in support of its

contention that the amendment did not have the effect of waiving its right to file a mechanic's lien.

Initially, Dunn cites the second sentence of paragraph 3.b. which states that "This agreement shall

not be construed to constitute a waiver, relinquishment or release of any claim, demand, right or

obligations of either Contractor or Owner with respect to the Contract and the Project."  Dunn

argues that a mechanic's lien is a statutory right and therefore not one under the Contract.  It notes

the distinction made in the second sentence between rights with respect to the Contract, which are

reserved for arbitration, and other rights or claims with respect to the Project, which would include

a mechanic's lien.

Dunn's position is supported by the holding in the case of *Dunn Industrial Group, Inc. v.*

*City of Sugar Creek*, 112 S.W.3d 421 (Mo. 2003).  In that case, the parties had entered into an

initial contract containing an arbitration provision.  The question before the court was whether a

44

change order to the contract providing that either party could resort to their contract remedies or

"remedies as provided by law" somehow vitiated the arbitration provision.  While the court

concluded the change order did not modify the arbitration clause, which remained enforceable, it

distinguished between "contract remedies" and "remedies as provided by law."  It held that the

former were subject to the arbitration provision, while the latter unspecified rights and remedies

were not and that this reservation was not inconsistent with the obligation to arbitrate.  Among

those "remedies" was the right to enforce a mechanic's lien under the Missouri mechanic's lien

statutes.  *Dunn*, 173 S.W.3d at 429.

   Waiver is the intentional relinquishment of a known right. *Bartleman v. Humphrey*, 441

S.W.2d 335, 343 (Mo. 1969).  Accordingly, the Court's primary task is to determine whether Dunn

intended to waive its right to file a mechanic's lien.  The issue before the Court is not strictly one

of contract interpretation because this is not a dispute between Trilogy and Dunn, the parties to the

contract.  Even if it were, the Court's task would be the same, since the cardinal principle of

contract interpretation is to ascertain the intention of the parties and to give effect to that intent.

*Dunn*, 112 S.W.3d at 428.  At the very least, it can be said that the juxtaposition of the cited

provisions creates an ambiguity in the Contract.  The Court may, therefore, consider evidence

extrinsic to the Contract in order to resolve that ambiguity.

   Dunn introduced extrinsic evidence that it was not its intention to waive its right to file a

mechanic's lien and additional evidence which suggested that Trilogy was not of that view either.

Dunn's witnesses testified without contradiction that subsequent to the Contract Amendment, the

parties continued to operate much the same way as they did prior to the amendment with regard to

submission and payment of invoices.  Critically, the evidence was that Trilogy continued to

45

require the execution and submission of lien waivers as a condition to payment.  If Trilogy was of

the view that the execution of the Contract Amendment waived Dunn's right to a mechanic's lien,

such waivers would not have been necessary.  In addition, Dunn's witnesses testified that in the

negotiation of the Contract Amendment, there were no discussions of waiver of lien rights, and

that mechanic's lien rights were not raised by any party in the arbitration proceeding.   The Court

does not find the latter fact surprising given that the purposes of the arbitration were expressly

limited.[12]  The Court's finding that the Contract Amendment did not effect a waiver of Dunn's

right to assert a mechanic's lien is consistent with the limited nature of the arbitration proceeding

as specified in that amendment.[13]

### B.   Abandonment of the Dunn-Trilogy Contract Does Not Affect Dunn's Right to Assert a Mechanic's Lien

---

[12]Paragraph 4.4.2.a. of the Contract Amendment specifies that the parties were to commence a limited arbitration proceeding ("Declaratory Proceeding") requesting a declaration of their respective rights regarding certain adjustments to the contract due to differences between the preliminary design documents and the final specifications and drawings for the Project ("Disputed Issue").  The sole purpose of that proceeding was to resolve disagreements between the parties about the manner in which those contract terms applied to this issue without addressing or resolving the effect of other differences between the preliminary design documents and the final specifications and drawings.  It also says that issues inconsistent with or in addition to those would not be introduced, admitted, or considered in this Declaratory Proceeding.  Paragraph 4.4.2.c. specifies that evidence is limited to that necessary to resolve this Disputed Issue in the Declaratory Proceeding.  Section 4.4.3. specifies that after the entry of an award in the Declaratory Proceeding, the parties would attempt to reach agreement on required contract adjustments given the arbitrator's finding and, if unable to do so, would commence an additional separate arbitration proceeding with a similarly limited scope.  In paragraph 4.4.4., the parties agreed that either party could demand arbitration regarding additional claims after the entry of the award in the Declaratory Proceeding.  Finally, paragraph 4.4.5.b. specifies that the failure to assert any claim in the Declaratory Proceeding, the Second Proceeding or any additional proceeding brought under paragraph 4.4.4. would not constitute a waiver of the right to assert any claim in a subsequent arbitration proceeding.

[13]Even if BBSSI were correct in arguing that Dunn had agreed to submit all disputes under the contract to arbitration, this would at most give Trilogy, the other contracting party, the right to file a motion to compel arbitration in the event Dunn initiated litigation to enforce rights under the Contract.  Trilogy has not done so and has arguably waived the right to do so by commencing this adversary proceeding seeking a declaration as to the validity and priority of numerous mechanic's liens asserted in connection with the Project, including Dunn's.  In addition, if the amendment thus only gave Trilogy the right to compel arbitration, a serious question arises as to whether BBSSI, a stranger to the Contract, has any right to insist that Dunn's only remedy lies in arbitration.  As no party raised these questions, however, the Court does not decide them and they have no bearing on its resolution of the arguments made.

BBSSI also argues that Dunn fails to qualify for a mechanic's lien because it did not perform the services or supply the materials at issue under or by virtue of a contract with the owner as required by Mo. Rev. Stat. §429.012.  That argument is based upon the fact that in the arbitration proceeding conducted between Dunn and Trilogy, the arbitrators determined that at some point the Contract between Trilogy and Dunn had been abandoned.  That finding was contained in an interim award dated January 26, 2009.  In their final award, issued on April 6, the arbitrators, noting their previous conclusion that the Contract had been abandoned, awarded damages to Dunn on a quantum meruit basis.  In sum, BBSSI argues that the existence of a contract is a prerequisite to claiming a lien as a prime contractor and that the arbitrators' finding that the Contract had been abandoned and awarding of damages on a quantum meruit theory demonstrates that Dunn fails to satisfy this requirement and is therefore not entitled to a mechanic's lien.

Initially, Dunn notes that while the arbitrators did find that the Contract was abandoned, they made no finding as to at what particular point in time the Contract was abandoned.  Given the arbitrators' failure to specify a date of supposed abandonment, it is impossible to determine whether amounts claimed by Dunn pursuant to its lien relate to services performed or materials provided after the date of abandonment.  In addition, as Dunn also notes, the arbitrators' findings are arguably inconsistent.  In their interim award, although finding that the Contract had been abandoned, they nonetheless also found that there was a de facto termination of the Contract sometime in September, 2008.

BBSSI cites no authority for the proposition that a lien claim should be denied under the circumstances present here.  Specifically, it is clear that there was a contract between Trilogy and

47

Dunn and that work was performed under and by virtue of that contract.  It is also clear that a

retrospective determination was made that at some point the legal effect of the parties' conduct

was an abandonment of the Contract.  There was no express abandonment, although both parties

claim to have terminated the Contract after all the work for which a lien is claimed had been done.

There is no Missouri case cited to or located by this Court which holds that a party performing

work pursuant to an admitted contract should be denied the right to assert a mechanic's lien

because the contract was subsequently abandoned by the parties (or deemed abandoned) and the

work for which a lien is claimed was performed subsequent to the abandonment.  The statute

requires that there be a contract.  The reason for that requirement, as Dunn points out, is to prevent

a person from claiming a mechanic's lien on an owner's property by virtue of a gratuitous

improvement not requested by the owner.  Dunn suggests, and this Court agrees, that the

contractual requirement in the statute should be construed with that purpose in mind.  Clearly, that

risk is not presented by the facts of this case.

The statute also requires that the work have been performed under and by virtue of the

contract.  As Dunn argues, neither the statute nor any Missouri case requires that the Contract be

found to be fully enforceable.  Neither is there any principle in the statute or in the Missouri case

law which would deny a claimant the right to assert a lien because the contract was subsequently

abandoned or determined in retrospect to have been abandoned.  The uncontradicted testimony

offered by Dunn is also to the effect that the goods and services supplied by it in connection with

the Project were done exclusively for the reason that there was a contractual relationship between

Trilogy and Dunn, notwithstanding the fact that the arbitrators may have subsequently determined

that at some point that relationship was abandoned.  Granting Dunn the right to assert a mechanic's

lien in these circumstances is consistent with the oft-quoted principle that the mechanic's lien laws are remedial in nature and to be interpreted as broadly as possible to effectuate the intention of the legislature to grant a remedy to those supplying goods and services for the improvement of real property. *Commercial Openings*, 819 S.W.2d at 349.

Finally, the Court agrees with Dunn that the Missouri Supreme Court's opinion in *Schwartz v. Shelby Construction Company*, 338 S.W.2d 781 (Mo. 1960), sheds some light on this situation favorable to Dunn's position. While it contains no express holding on the point, the opinion in *Shelby* confirms an award by a lower court of the right to assert a mechanic's lien to an entity which supplied goods and services pursuant to a contract which was subsequently abandoned by the parties. The court concluded that the parties' conduct resulted in a legal abandonment of the contract and yet affirmed an award for plaintiff of a mechanic's lien for a claim based on quantum meruit. BBSSI attempts to distinguish the case on the grounds that it involves a claim by a subcontractor rather than a prime contractor, but a close examination of the case does not support that distinction. Although the claimant is referred to as a subcontractor, it was an original contractor to the owner. The Court is bound to apply the Missouri law to the extent that it can discern it. There is apparently no law precisely on point. While the court in *Schwartz* did not expressly hold that a party is entitled to assert a mechanic's lien for services performed under a contract subsequently determined to be abandoned, it affirmed a lower court holding which effectuates that result. It therefore gives the Court some indication that the Missouri Supreme Court did not consider these results inconsistent. For all these reasons, the Court rejects BBSSI's argument that Dunn is not entitled to asserted a mechanic's lien under Missouri law because it does not satisfy the contractual requirement of the statute.

49

## V. <u>MEMORANDUM OPINION DENYING J.E. DUNN'S OBJECTIONS TO MECHANIC'S LIEN CLAIMS FILED BY CERTAIN CLAIMANTS</u>

Dunn has objected to liens claimed by seven of the mechanic's lien Claimants on the ground that they are not entitled to a first priority lien on a *pari passu* basis with J.E. Dunn and its subcontractors.[14]   With respect to E&K and Mark One,  Dunn contends that their liens arise under two separate contracts (one as a subcontractor of Dunn and another as a contractor of Trilogy) and, therefore, they were required to file two separate liens. Dunn also contends that its contract was abandoned or terminated, so the Claimants who performed work for Trilogy after Dunn ceased work on the Project are not entitled to the benefit of the "first spade rule." This Court disagrees on both counts.  Based on the discussion that follows, Dunn's objections are overruled.

### A. <u>Separate Contracts – One Lien</u>

The general rule in Missouri is that materials furnished under distinct contracts cannot be mingled in one account and a lien obtained for the aggregate amount. *Berkshire v. Hall*, 202 S.W. 414, 415 (Mo. App. 1918).[15]   Whether distinct contracts exist is a question of fact. *Midwest Floor,* 304 S.W.3d at 248.  There is, however, an equally established exception:

> [W]here work done or material furnished all go to the same general purpose, as the building of a house or block of houses and buildings appurtenant thereto, though such work done or materials furnished were not contracted for on the same day or at

---

[14]The original Claimants objected to by Dunn were Walton Construction Co. LLC, Metro Tile Contractors, Inc., Patent Construction System, a division of Harsco Corp., Mark One Electric Co. (as to Claim B for $41,788.58), E&K of Kansas City, Inc., Super Sky Products, Inc., The Bratton Corp. (to the extent of $25,206), and Applied Technical Services, Inc.  Since the objection was filed, Harsco withdrew its claim.

[15]"Most of the cases in which this rule was applied to defeat a lien action were instituted by original or subcontractors who had done work or furnished material under separate contracts, but sought to obtain a lien for everything after the time limit for filing on an earlier contract had expired by limitation by claiming the limitation began to run from the close of the account under the later contract." *Berkshire, supra*, at 415. That consideration is not relevant here.  Moreover, the case law that developed focused less on the number of contracts under which the contractors performed and more on the nature of the work (*i.e.,* whether it was done as part of one general improvement).

> the same time, yet *if they were done and furnished as parts of a general improvement of the property, all such work and materials may be regarded as done and furnished under one contract and may be included in one lien account.*

*Flanagan Bros. v. O'Connell*, 88 Mo. App. 1, 4 (Mo. Ct. App. 1901)(emphasis added). Put another way, "if the several parts form an entire whole, or are so connected together as to show that the parties had it in contemplation that the whole should form but one, and not distinct matters of settlement, the whole account must be considered as a unit, or as being a single contract." *Page v. Bettes*, 17 Mo. App. 366, 1885 WL 7691, *6 (Mo. Ct. App. 1885)(citations omitted). The case of *Midwest Floor* illustrates this. The contractor in that case was hired by the property owners for "slope reinforcement and retaining wall base" in connection with the construction of a driveway and the parties entered into an agreement. When the contractor was unable to locate stable ground, the parties agreed to stop the project and consult an engineer. A new plan was developed to install storm piping and then fill the ravine to make the retaining wall base. The same contractor completed the work and filed a lien for the entire amount due under both proposals: the first one for excavation of the site and the second one for installation of the pipe. The property owners asserted that because there were two separate contracts, a separate mechanic's lien should have been filed for each. Further, one of the invoices represented the amount due under the first contract and in terms of that portion, the lien was not timely filed. The contractor argued that there was one continuous contract to construct a retaining wall base and that the project resumed after new plans were formulated. The *Midwest Floor* court agreed:

> All the materials and work in this case were provided to build a retaining wall base for the [owners'] rear entry garage. The labor under both proposals was furnished as part of this same general improvement to the property. ...We regard the installation of the pipe and the construction of the retaining wall base as one unit, because the retaining wall base could not be constructed without the pipe.

*Id.* at 249.

In *Schroeter Bros. Hardware Co. v. Croatian "Sokol" Gymnastics Ass'n.*, 58 S.W.2d 995

(Mo. 1932), the contractor was originally hired to complete construction of a recreation-type

building.  Several months into the project, however, the owner decided to change part of the

building from a pool to a "picture show," and entered into another contract with  the contractor to

carry out the new plans.  As the building progressed, additional changes were made; the contractor

subsequently filed a single mechanic's lien covering all of his work.  The property owner argued

that the contractor's lien was based on several distinct contracts which could not be perfected by

filing one lien statement.  The court rejected that argument:

> The various proposals...were merely modifications of and additions to
> his original contract.  The building he completed was still the same
> building, with the same outside dimensions, the same number of
> stories, and it remained a building constructed for the same original
> general purposes.  The various additional things he did were all parts
> of the same single whole, since they were done while the main
> contract was being performed, before the building was finished, and
> as a part of the work of completing the building under the original
> contract.

*Id.* at 1000.  Accordingly, the court held that all of the contracts could be embraced in one lien.

The question of there being one or more contracts depends largely upon the intention of the

parties.  *See Louisiana & Gulf Lumber Co. v. Myers*, 87 Mo. App. 671, 1901 WL 1629, *2 (Mo. Ct.

App. 1901)(although purchases of materials were not included in one single transaction, "it must

have been in the contemplation of the parties that other material would be furnished if needed" to

complete the one improvement).  Courts examine the way the parties transact business to make that

determination.

For example, the defendant in *Flanagan Brothers*, *supra*, entered into a contract to erect two

52

residence buildings and a boiler house.  The plaintiffs contracted with the defendant to perform all

the brick work on those buildings.  The property owners asserted that the subcontractor's work was

performed under two separate and distinct contracts requiring two liens to be filed.  The manner in

which payments were made by the contractor to the subcontractors was evidence that the parties

understood that the subcontractor would do the work under one contract.  Aside from that

determination, the court looked at the end product:   "But even if the two propositions and the

acceptance thereof constituted two separate contracts for doing the work and furnishing the

materials, yet as such contracts were between the same parties and, too, as the evidence shows that

such work and materials all went into one general improvement of the property...such work and

materials should be regarded as furnished under one contract within the meaning of the mechanics'

lien statute." *Flanagan Brothers,* 88 Mo. App. 1 at *6; *see also Progress Press-Brick & Machine

Co. v. Gratiot Brick & Quarry, Co.*, 52 S.W. 401, 403 (Mo. 1899)("The brick and the press-brick

machine were not contracted for on the same day, it is true, but they were bought and furnished as

parts of one general improvement of the property" and must therefore "be regarded as having been

furnished under a single contract....").

     Here, the fact that both Mark One and E&K performed for Dunn as subcontractors under

their respective contracts, and later as contractors for Trilogy under their respective contracts is

inconsequential.   The parties' intentions are clear from the evidence.  The footprint or physical

dimensions of the Project never changed from the time Dunn stopped working and the time that

Walton became construction manager.   Further, neither the owner nor the owner's vision of the

Project changed.   After E&K executed the assignment agreement, the president of the company

believed that E&K was still operating under the original contract it had entered into with Dunn – he

never felt that the original contract had been abandoned.  The scope of Mark One's electrical work

remained the same both before and after Dunn stopped working on the Project.  In fact, Mark One

never demobilized.  The president of the company believed that Mark One would continue working

on the Project and that this was just another "bump in the road."   There is no evidence in the record

to show that the parties contemplated separate transactions – E&K and Mark One performed  work

for one owner, one Project, and one purpose.   As a result, the fact that each of those Claimants

filed single liens encompassing all of the work and materials they provided under distinct contracts,

in different capacities, does not invalidate the liens.

## B. First Spade

Many states adhere to what is known as "the first spade rule":  the mechanic who finishes a

new building is entitled to a lien, for the labor and material he supplies, of the same priority as the

one who began the construction.  *See  Gardner v. North Kansas City Alfalfa Mills*, 61 S.W.2d 374,

376 (Mo. Ct. App. 1933)("All mechanic's liens commence at the date of the first stroke of the ax or

spade and continue in the erection of the house without regard to the time of their being filed, or of

the doing of the work, or furnishing of the materials.")(citations omitted). [16]   The source of the first

spade rule in Missouri is Mo. Rev. Stat. §429.260:

> The liens for work and labor done or things furnished, as specified in
> sections 429.010 to 429.340, shall be upon an equal footing, without
> reference to the date of filing the account or lien; and in all cases
> where a sale shall be ordered and the property sold, which may be
> described in any account or lien, the proceeds arising from such sale,
> when not sufficient to discharge in full all the liens against the same
> without reference to the date of filing the account or lien, shall be
> paid pro rata on the respective liens; provided, such account or liens
> shall have been filed and suit brought as provided by said sections.

---

[16]This Court has previously ruled that, for purposes of the first spade rule, the visible commencement of
actual operations on the ground for the erection of the Project's first building occurred on December 13, 2005.

54

The *Gardner* case involved a lien priority dispute between a contractor and a lender in connection with the building of what became an alfalfa mill.  The lender asserted that its deed of trust primed the mechanic's lien, arguing that the original construction was  merely for a building, not an alfalfa mill, that the contract was completed before the materials covered by the lien were furnished, and that the deed of trust was dated and recorded prior to that time.  The question before the court was whether the building and mill were originally intended to be erected (*i.e.*, whether  the contractor's contract was contemplated to be part of the construction from the start).  Based on the testimony of the landowners, the character of the construction and the language of the contract, the trial judge had ample evidence to answer affirmatively:

> The building in this case was not abandoned or allowed to rest until a new enterprise with a different object was undertaken, but remained the same, and it was completed by plaintiffs within a reasonable time; the lapse between the work on the building and the completion thereof by plaintiffs being only 30 days, which was a short time considering the time necessarily required to install the heavy machinery and fasten it to the floor and foundation of the building, before adding the pipes and ducts, etc. supplied by plaintiffs and necessary to be made and set in place before the structure could be used as a mill at all.  The short lapse of time mentioned above did not separate the matter into two undertakings nor make of plaintiffs' contract a separate and entirely new enterprise....

*Gardner*, 61 S.W.2d  at 376.

Dunn contends that the Claimants cannot reap the benefits of the first spade rule because arbitrators previously determined that Dunn's contract was abandoned.  Dunn misses the point. Cases addressing the application of the first spade rule, particularly recent decisions, focus on whether work resumed on a single improvement or undertaking, not on whether work resumed under a single contract.

To substantiate its position, Dunn relies on *May v. Mode*, 123 S.W. 523 (Mo. Ct. App.

55

1909).   The chronology of events in *May* is significant:  the original contractor commenced

construction, work ceased and the contractor abandoned the job, the deed of trust was recorded, a

new contractor was hired to complete the construction, and that contractor secured a mechanic's

lien.  The issue presented was this:

> When the erection of a building has been commenced under contracts
> and on plans looking to its completion, but before completion work is
> stopped on it, and the contract abandoned, do those contractors and
> materialmen who thereafter undertake its completion under new
> contracts made with them have a right to a lien for work and labor
> done and materials furnished by them under these new contracts, on
> the land or improvements, prior and superior to the lien of a mortgage
> or deed of trust, placed on the land and duly of record, *after cessation
> of all construction work under the first contract*, but prior to the
> doing of work and labor, or furnished material under the new or
> second contracts?

*Id.* at 525 (emphasis added).   Basing its opinion in large part on the first spade rule, the court held

that they did not.

As the Claimants point out, *May* is factually distinguishable from the circumstances of the

case at hand, and as such, is not persuasive.  In *May*, the work on the project came to a complete

standstill.  Here, Trilogy continued to provide security for the site, pay insurance costs, cover

temporary utility fees, and seek other contractors to complete the Project as originally envisioned.

In *May*, work did not commence until five months after work ceased.  Here, efforts to find another

construction company to replace Dunn happened immediately.  Indeed, Walton's first pay

application was dated November 25, 2008, approximately two months after Dunn's contract was

terminated.  Trilogy remained committed to resuming construction quickly and sought to enable

work to progress continuously and seamlessly.  This is evident by Trilogy's efforts to secure the

continued performance of the Claimants,  key subcontractors on the Project.  In *May*, the property

owner hired a different contractor to complete the buildings – the new contracts were "entirely

independent and distinct from, any contract, or contracts made at the time the buildings were

originally commenced." *May,* 123 S.W. at 523.  Here, two of the Claimants' contracts, those of

E&K and Super Sky, were simply assigned from Dunn to Trilogy – in effect, a continuation of the

original contracts under which those Claimants had operated since the inception of the Project.[17]

The remaining Claimants did in fact enter into new contracts with Trilogy.  Their work, however,

was unchanged – they continued to follow the design and specifications of the original architect

under the direction of the original owner.   In short, *May's* holding applies to a situation in which

work done under an original contract has ceased, that contract has been abandoned, and the work is

completed under a distinct contract with a different contractor.  That is not the situation here.

The case of *Joplin Cement Co. v. Greene County Building & Loan Ass'n.*, 74 S.W.2d 250

(Mo. Ct. App. 1934), is on point.  In *Joplin*, the property owner negotiated a loan and began the

erection of some improvements on his land, employing materialmen to furnish necessary supplies.

Subsequently, the lender's deed of trust was recorded.  The lender paid the bills for material and

labor out of the loan proceeds.  At some point, the lender notified the materialmen that the funds

were exhausted and instructed them not to furnish any more material. There was no evidence that

the work in fact ceased or was abandoned prior to its completion by the same materialmen who had

started it.  It was undisputed that the "first spade was turned" prior to the date of the deed of trust.

The trial court ruled that the lender's deed of trust had priority over the mechanic's liens.  On

appeal, the lender cited the *May* case for the rule that, "where, after a building has been partly

---

[17]At trial, Dunn questioned the validity of the assignments and argued that these contracts were actually
new separate contracts.  That issue is irrelevant to the Court's analysis because this matter turns on whether there
existed continuity of work on the Project, not on whether there existed one or more contracts.

erected under a contract providing for its completion, the work is stopped and the contract

abandoned, and a deed of trust is placed on the property, and, thereafter, a new contract is made

providing for the completion of the building, the latter contract does not relate back to the original

abandoned contract and work, so as to give a mechanic's lien for work done under the second

contract priority over the deed of trust." *Joplin*, 74. S.W.2d at 252.   The court noted that, unlike in

the *May* case, there was no evidence here that the work was ever abandoned, and the same parties

who had furnished materials originally were the ones seeking to establish their mechanic's liens.

Further, "[i]t must have been within the contemplation of all parties concerned at the time the loan

was made that the building would be completed." *Id.*   Thus, judgment was reversed.

In *Midwest Floor,* the court rejected the owners' argument that because the work stopped,

the new contract was separate and distinct from the old one, and should not have priority status:

> The [owners] are correct that when work is abandoned and is later resumed under a
> new contract between different parties, the new contract will be separate and distinct
> from the old, and will not have priority over a deed of trust executed before the
> second contract. ... However, *the work in this case was never abandoned, and the
> work was not continued by different parties.*  The parties stopped excavation in June,
> but continued to 'work' on the project by formulating new plans to overcome
> unforeseen obstacles.  Therefore, we hold that [the contractor] may maintain a single
> lien for the work performed on the [owners'] property.

*Id.* (emphasis added) (citations omitted).

In short, the critical question in this Court's analysis, as the case law indicates, is whether

the *Project* was abandoned, not whether the Contract was abandoned.   Based on the uncontroverted

evidence set forth above, the answer must be "no."

The purpose of Missouri's lien laws is to give security to mechanics and materialmen for

labor and materials furnished in improving the owner's property.  *R.L. Sweet Lumber Co. v. E.L.

Lane, Inc.*, 513 S.W.2d 365, 371 (Mo. banc 1974).  The statutes are to be liberally construed in

58

favor of the claimant. *Maran-Cooke, Inc. v. Purler Excavating, Inc.*, 585 S.W. 2d 38, 40 (Mo. 1979). To deny the Claimants the right to a lien that is on "equal footing" contravenes the policy underlying the Missouri statutes.

Nothing in the record before this Court supports Dunn's accusation that the Claimants were "attempting to boot strap onto [its] priority." There is no statutory basis to subordinate the Claimants' liens, nor do the cases cited by Dunn, *May* or *Midwest Floor*, support that result. In fact, the latter supports the contrary position. Furthermore, to allow the Claimants' liens to share first priority on a *pari passu* basis with Dunn and its subcontractors is consistent with the policy considerations articulated in the previous section of this Opinion, namely that mechanics and materialmen are entitled to share priority status so long as the work is performed and materials are furnished for one general improvement, and the requirements of Missouri's lien laws are met. In this case, the record indicates that the Claimants, despite a brief interruption, worked to complete one project and satisfied the statutory requirements to perfect their liens. Accordingly, Dunn's objections are hereby denied[18].

## VI.  SUMMARY

Based on earlier rulings as well as the above opinion, this section will summarize the status of the mechanic's lien claimants.

A.T. Switzer Company- The Court grants the motion for summary judgment filed by BBSSI against A.T. Switzer Co. for failure file a mechanic's lien with the Jackson County Clerk of the Court.

A2MG, Inc.- The Court allows A2MG's mechanic's lien that was in dispute. The parties should determine any duplicative amounts in Dunn's lien.

---

[18] To the extent that BBSSI made these same objections, those are also overruled for the same reasons.

American Fire Sprinkler Corp.- The Court granted BBSSI's motion for summary judgment against American and its claim was discharged by the Court for failure to timely file a claim form.

Applied Technical Services, Inc.- The Court grants BBSSI's motion for summary judgment against ATS for failure to comply with the required statutory notice requirements.

Belger Cartage Services, Inc.- The Court granted BBSSI's motion for summary judgment against Belger and its claim was discharged by the Court for failure to timely file a claim form.

Ceco Concrete Construction- The Court will enter an order discharging Ceco's mechanic's lien for failure to file a timely objection to the Report.

E&K of Kansas City, Inc.- The Court allows E&K's mechanic's lien that was in dispute.  The parties should determine any duplicative amounts in Dunn's lien.

Enterprise Precast Concrete- The Court will enter an order discharging Enterprise's mechanic's lien for failure to file a timely objection to the Report.

Gould Evans Associates- The Court allows Gould Evan's mechanic's lien except for the sum of $16,969 claimed for arbitration services.

Harsco Corporation, d/b/a Patent Construction Services- Harsco withdrew its claim.

Hayes Drilling, Inc.- The Court allows Hayes' mechanic's lien that was in dispute.

Jim Kidwell Construction- The Court granted BBSSI's motion for summary judgment against Kidwell and its claim was discharged by the Court for failure to timely file a claim form.

J.E. Dunn Construction Co.- The Court previously ruled on the statutory notice issue in Dunn's favor and denied Trilogy's motion for summary judgment joined by BBSSI.  For the reasons discussed in this opinion, the Court allows Dunn's mechanic's lien except for those amounts that are duplicative of other contractors'/subcontractors' lien claims.  The parties should determine what

60

amounts are duplicative and submit the final claim amount for the Court to enter an order allowing

Dunn's claim in accordance with the above ruling.  Further, as discussed above, Dunn's objection

to certain claimants' mechanic's liens based on priority is overruled and all claimants will share

equally.

<u>Mark One Electric</u>- The Court allows Mark One's mechanic's lien claims.

<u>McCownGordon Construction, LLC</u>- The Court granted BBSSI's motion for summary judgment

against McCownGordon and its claim was discharged.

<u>Metro Tile Contractors, Inc.</u>- The Court allows Metro Tile's mechanic's lien claim.

<u>P & J Arcomet LLC</u>- The Court granted BBSSI's motion for summary judgment against P & J

Arcomet and its claim was discharged.

<u>Rodriguez Mechanical Contractors, Inc.</u>- The Court allows Rodriguez's mechanic's lien claim.

<u>S&W Waterproofing</u>- The Court allows S&W's mechanic's lien claim.

<u>Super Sky Products</u>- The Court allows Super Sky's mechanic's lien claim in the reduced amount of

$15,750 to which the parties agreed.

<u>The Bratton Corporation</u>- The parties have stated that there is no dispute as to Bratton's claim

except for Dunn has included it in its objection regarding priority to the extent of $25,200.

Therefore the Court will allow Bratton's mechanic's lien claim as filed.

<u>The Fagan Company</u>- Fagan was dismissed by the Court.

<u>Walton Construction Co., LLC</u>- The Court previously ruled on the statutory notice requirement in

Walton's favor and denied BBSSI's motion for summary judgment.  Also, based on the foregoing

discussion, the Court allows Walton's mechanic's lien claim

The Court requests that the parties determine final claim amounts in accordance with the foregoing opinion and rulings, eliminate any duplicative lien claim amounts and submit a final proposed order to the Court.  The Court will then enter a final order regarding mechanic's lien claim amounts.

ENTERED this 29th day of December, 2011.

/s/ Dennis R. Dow

United States Bankruptcy Judge

Copies to:

Jonathan A. Margolies

John J. Cruciani

Robert M. Pitkin

All interested parties

62